IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
NO. 2:17-CV-00004-FL

| | |
|---|---|
| SAVE OUR SOUND OBX, INC., THOMAS ASCHMONEIT, RICHARD AYELLA, DAVID HADLEY, MARK HAINES, JER MEHTA, and GLENN STEVENS,<br><br>              Plaintiffs,<br><br>v.<br><br>NORTH CAROLINA DEPARTMENT OF TRANSPORTATION, JAMES H. TROGDON, III, in his official capacity as Secretary of the North Carolina Department of Transportation, FEDERAL HIGHWAY ADMINISTRATION, and JOHN F. SULLIVAN, III, in his official capacity as Division Administrator for the Federal Highway Administration,<br><br>              Defendants,<br><br>and<br><br>DEFENDERS OF WILDLIFE and NATIONAL WILDLIFE REFUGE ASSOCIATION,<br><br>              Defendant-Intervenors. | PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL COMPLETION OF THE ADMINISTRATIVE RECORD |

## INTRODUCTION

Plaintiffs challenge the decision of Defendants North Carolina Department of Transportation ("NCDOT") and the Federal Highway Administration ("FHWA") to approve construction of a 2.4-mile, $145 million jug-handle bridge (the "Jug-Handle Bridge") along North Carolina Highway 12 ("NC-12") in the Outer Banks. On July 7, 2017, Defendant FHWA lodged the Administrative Record ("AR") for this case. D.E. 59. Plaintiffs bring this motion to compel Defendants to complete the AR by including documents that were essential to their

1

decision to approve the Jug-Handle Bridge project, and that Defendants purposely omitted from the AR.

In compliance with the amended case schedule entered by this Court on June 21, 2017, D.E. 58, Plaintiffs informed Defendants of the AR's deficiencies on July 27, 2017. Ex. A. FHWA responded on August 7. Ex. B. Although FHWA acknowledged certain deficiencies and agreed to supplement the AR to address them, FHWA refused to supplement the record with a critical category of documents—those regarding settlement negotiations between Defendants and Defendant-Intervenors that shaped a legal settlement that required Defendants to take a number of steps in furtherance of the Jug-Handle Bridge.

Because these documents were before FHWA during its decision-making process and are relevant to Defendants' predetermined and illegal decision to approve the Jug-Handle Bridge, Plaintiffs respectfully move this Court to order Defendants to complete the AR by adding all non-privileged documents regarding the aforementioned settlement negotiations to which FHWA was a party or that were in FHWA's possession prior to April 30, 2015 (the execution date of the settlement agreement). The record should include all settlement-related communications between FHWA and other parties, including Defendant-Intervenors, NCDOT, or other agencies involved in the project. In the alternative, Plaintiffs respectfully request that the Court consider the settlement negotiations as extra-record evidence relevant to Defendants' illegal decision.

Given the unique timeframe of this case—summary judgment briefing is currently scheduled to be completed by November 21, 2017, and Defendants have represented that bridge construction is scheduled to commence in March 2018—Plaintiffs respectfully request expedited consideration of this motion so that the parties may incorporate the added documents into their summary judgment briefs.

2

Case 2:17-cv-00004-FL   Document 61   Filed 08/28/17   Page 2 of 19

## NATURE OF THE CASE AND FACTUAL BACKGROUND

Defendants challenge approval of the Jug-Handle Bridge as the selected alternative for Phase IIb of the Bonner Bridge Replacement Project along NC-12 on a number of grounds. Plaintiffs have brought claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the National Environmental Policy Act of 1971 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and Section 4(f) of the Department of Transportation Act of 1966 ("Section 4(f)"), codified at 23 U.S.C. § 138 and 49 U.S.C. § 303. The most relevant claim for the instant motion is Plaintiffs' contention that the selection of the Jug-Handle Bridge as the Phase IIb alternative was not the result of an objective and public alternatives analysis conducted in compliance with NEPA, but rather the unlawfully predetermined result of confidential negotiations between Defendants and Defendant-Intervenors.

The path to unlawful predetermination began in July 2011, when Defendant-Intervenors—represented by the Southern Environmental Law Center ("SELC")—sued Defendants over the their plans to replace the deteriorated Bonner Bridge over Oregon Inlet pursuant to Phase I of the Bonner Bridge Replacement Project.[1] *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, No. 11-CV-35 (E.D.N.C. filed July 1, 2011). In 2013, this Court ruled in favor of the Defendants, *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 971 F. Supp. 2d 510 (E.D.N.C. 2013), and Defendant-Intervenors appealed to the U.S. Court of Appeals for the Fourth Circuit. The Fourth Circuit affirmed in part, reversed in part, and remanded back to this Court. *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374 (4th Cir. 2014). By remanding fact-intensive issues back to this Court, the Fourth Circuit's decision

---

[1] Eugene Conti, Jr., was the Secretary of NCDOT when the Bonner Bridge suit was filed. He was therefore named as a defendant in his official capacity, whereas James H. Trogdon, III, is the NCDOT official named as a defendant in the instant suit. The other three defendants—NCDOT, FHWA, and John F. Sullivan, III—are the same in both suits.

increased the prospects of protracted litigation that could jeopardize completion of a Bonner Bridge replacement.

While the aforementioned lawsuit was pending, there were several developments to aspects of the Bonner Bridge Replacement Project other than the actual replacement of the Bonner Bridge under Phase I. In August 2011, Hurricane Irene struck the North Carolina coast and damaged NC-12 in two locations—in northern Rodanthe at the S Curves and within the Pea Island National Wildlife Refuge (the "Refuge") approximately six miles south of Oregon Inlet. RD 11560–61. In February 2013, Defendants issued an Environmental Assessment for Phase IIa, which was intended to provide long-term improvements to the damaged stretch of NC-12 within the Refuge six miles south of Oregon Inlet.[2] A Record of Decision for Phase IIa was issued in October 2013. RD 10739.

Defendants also sought to provide long-term improvements to NC-12 in the Rodanthe S Curves, and in December 2013, they issued an Environmental Assessment addressing these improvements (the "2013 Phase IIb EA"). RD 11542. The 2013 Phase IIb EA identified four alternatives: (i) Bridge on New Location (*i.e.*, the Jug-Handle Bridge);[3] (ii) a bridge within the existing NC-12 easement (the "Easement Bridge"); (iii) beach nourishment—an erosion-prevention strategy involving the replenishment of sand; and (iv) beach nourishment combined with a bridge within the existing easement. RD 11567–68. Although the 2013 Phase IIb EA

---

[2] *See* Environmental Assessment for Pea Island Long-Term Improvements Bonner Bridge Replacement Project Phase IIa, Feb. 2013, *available at* https://www.ncdot.gov/projects/NC12PeaIsland/download/B2500PhaseIIaEA_Pea_Island_Inlet.pdf; FHWA has represented to Plaintiffs that it will be supplementing the AR to include the 2013 Phase IIa EA, which was improperly excluded from the AR when it was initially lodged on July 7, 2017. *See* Ex. B at 1.

[3] The selected Jug-Handle Bridge is closer to the shoreline than the Jug-Handle Bridge alternative assessed in the 2013 Phase IIb EA. *See* RD 28629.

identified beach nourishment and beach nourishment combined with a bridge within the existing easement as alternatives, Defendants summarily rejected these alternatives by stating that the Merger Team had already decided to eliminate them from detailed study years earlier.[4] RD 11571.  Between the two Phase IIb detailed study alternatives—the Easement Bridge and the Jug-Handle Bridge—the 2013 Phase IIb EA identified the Easement Bridge as the preferred alternative.  RD 11586; *see also* RD 11572 (diagram showing Easement Bridge and Jug-Handle Bridge alternatives).

In light of the ongoing Phase IIb project and eager to disentangle themselves from litigation that jeopardized replacement of the Bonner Bridge, Defendants used the Phase IIa and Phase IIb projects as bargaining chips to persuade Defendant-Intervenors to dismiss their challenge to the Bonner Bridge replacement.  Following "confidential negotiations" between Defendants and Defendant-Intervenors, during which time the Phase IIb decision-making process was put "on hold pending the outcome of those discussions," RD 16238, Defendants entered into a settlement agreement (the "Settlement Agreement") pursuant to which they explicitly agreed to reverse course regarding their previously identified Phase IIb preferred alternative—the Easement Bridge—and instead take steps in furtherance of the Jug-Handle Bridge.  RD 16622–53.  The Settlement Agreement also required Defendants to rescind their

---

[4] The Merger Team consists of representatives from the federal and state environmental resource and regulatory agencies that have an interest in the Bonner Bridge Replacement Project: FHWA, NCDOT, the U.S. Fish and Wildlife Service, the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, the National Marine Fisheries Service, the National Park Service, the North Carolina Department of Cultural Resources, the North Carolina Department of Environment and Natural Resources ("NCDENR") – Wildlife Resources Commission, the NCDENR – Division of Water Quality, the NCDENR – Division of Coastal Management, and the NCDENR – Division of Marine Fisheries.  RD 1552.

contract for construction of the Phase IIa project, for which a Record of Decision had already been issued.  RD 16623.

Specifically, the Settlement Agreement required NCDOT to "identify Phase IIb Bridge on New Location [*i.e.*, the Jug-Handle Bridge] as its preferred alternative and seek Merger Team Concurrence Point 3."  RD 16624 ¶ 1(c).  As expressed in the Merger Team Memorandum of Understanding, RD 18088, Concurrence Point 3 is the identification of the least environmentally damaging practicable alternative, or LEDPA.  RD 18091.  Thus, the Settlement Agreement obligated NCDOT to seek the Merger Team's designation of the Jug-Handle Bridge as the least environmentally damaging of all available alternatives, regardless of what may be concluded pursuant to an objective analysis.  The Settlement Agreement also required the North Carolina Department of Environment and Natural Resources, Division of Coastal Management ("DCM"), to "provide a written statement of [its] support and preference for [the Jug-Handle Bridge]" and to "otherwise . . . use best efforts to help NCDOT attempt to secure Merger Team concurrence." RD 16624–25 ¶ 1(e).

Furthermore, the Settlement Agreement provided that, in the event that the Merger Team concurred that the Jug-Handle Bridge was the Phase IIb LEDPA, NCDOT and FHWA *must* "promptly revise" the Section 4(f) Evaluation and "associated document prepared pursuant to NEPA" (i.e., a revised EA) by identifying the Jug-Handle Bridge as the preferred alternative, in addition to "[p]ropos[ing] to identify the Phase IIb [Jug-Handle Bridge] Alternative as the 'least overall harm' alternative."  RD 16626–27 ¶ 3(c)(i).  *Only* if the Jug-Handle Bridge was identified as the LEDPA, among other commitments required of Defendants, were the Defendant-Intervenors obligated to dismiss their suit regarding Phase I, and allow the Bonner Bridge project to proceed.  RD 16625 ¶ 1(h).  Notably, in their motion to intervene in the instant suit,

6

Defendant-Intervenors all but admitted that the Settlement Agreement was a sweetheart deal, stating that "[i]f [Defendant-Intervenors] are not allowed to intervene, they will unable [*sic*] to protect the value they have attained through the settlement agreement . . . ." D.E. 19-1 at 17. Given that Defendant-Intervenors would be fully entitled to participate in any further NEPA analysis resulting from the instant litigation, this statement directly implies that Defendant-Intervenors extracted concessions through the Settlement Agreement that they otherwise would not have been able to obtain through an impartial NEPA process open to all members of the general public. Such an arrangement flies in the face of NEPA's requirement that an agency's analysis of environmental impacts and alternatives "provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

This *quid pro quo*, bridge-for-a-bridge bargain appeased Defendant-Intervenors by furthering their agenda of eliminating sections of highway from the Refuge. Specifically, the Jug-Handle Bridge would entail moving a short stretch of NC-12 from the current easement to a bridge over Pamlico Sound, thereby eliminating part of NC-12 from the Refuge and opening the possibility of a future extension to the Jug-Handle Bridge that would remove further stretches of highway from the Refuge. *See* RD 16627 ¶ 3(c)(iii) (requiring NCDOT, in the event the Jug-Handle Bridge is identified as the least environmentally damaging practicable alternative, to plan, design, and construct the Jug-Handle Bridge "so as not to preclude the addition of a later extension into the Pamlico Sound to the north").

In exchange for Defendants' commitments to promote the Jug-Handle Bridge in lieu of other Phase IIb alternatives, Defendant-Intervenors agreed to voluntarily dismiss their suit regarding Phase I, thereby allowing Defendants to proceed with the replacement of the Bonner Bridge. RD 16625 ¶ 1(h). Unsurprisingly, in June 2015, less than two months after the

Settlement Agreement was executed, the Merger Team, led by NCDOT and FHWA, identified the Jug-Handle Bridge as the LEDPA. RD 23565. To comply with their part of the *quid pro quo*, Defendant-Intervenors shortly thereafter dismissed their suit challenging the Bonner Bridge replacement, thereby clearing the way for Phase I construction. *See* Ex. C (joint stipulation of dismissal).

Construction of the Bonner Bridge replacement commenced on March 8, 2016,[5] and Defendants identified the Jug-Handle Bridge as their Phase IIb preferred alternative in a Revised Phase IIb EA issued on May 24, 2016. RD 23418. The 2016 Revised Phase IIb EA states that it "takes into account" the terms of the Settlement Agreement but, without factual or legal support, protests that "[t]he stipulations did not predetermine the choice of the [Jug-Handle Bridge] Alternative as the Preferred Alternative." RD 23443. This conclusory and unconvincing statement is belied by the fact that the Settlement Agreement explicitly required NCDOT to identify the Jug-Handle Bridge as the preferred alternative for Phase IIb, and required both NCDOT and FHWA to revise the EA to reflect this reversal from the 2013 Phase IIb EA, which had identified the Easement Bridge as the preferred alternative.

Although the AR contains the Settlement Agreement itself, it does not include any communications or other documents regarding the settlement negotiations between Defendants and Defendant-Intervenors. These documents will provide additional support to Plaintiffs' claims that Defendants ignored NEPA's mandated assessment of the impacts of the 2.4-mile, $145-million bridge, and instead predetermined the outcome in order to placate Defendant-Intervenors in regard to their demands for a separate phase of the project.

---

[5] *Governor McCrory Breaks Ground for a New Bonner Bridge; Celebrates as Construction Begins*, N.C. DEP'T OF TRANSP., https://apps.ncdot.gov/newsreleases/details.aspx?r=12282 (last visited Aug. 28, 2017).

# ARGUMENT

### A. The Record Must Include All Materials Which the Agency Considered in Making Its Decision.

The APA provides that, when reviewing agency action, "the court shall review the whole record." 5 U.S.C. § 706. Although the APA does not explicitly detail what constitutes the "whole record," courts have generally held that a complete record must include all documents and materials that were before the agency when the relevant decision was made. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Included within this scope are "'all documents and materials directly or indirectly considered by the agency' in making the decision in question." *Ohio Valley Envtl. Coal. v. Whitman*, 3:02-CV-0059 at 3 (S.D. W. Va. Jan. 7, 2003) (unpublished, Ex. D) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993)). *See also Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 196 (D.D.C. 2005) ("[T]he record must include all documents that the agency 'directly or indirectly considered.'") (citation omitted).

The record in an APA case is not limited to finalized documents, but rather must include predecisional documents that were considered by agency personnel in advance of the final decision. *See Ohio Valley Envtl. Coal.*, 3:02-CV-0059 at 9 ("[T]he administrative rulemaking process is precisely one of initial proposals, comments, compromise, revisions, and final drafts, and the materials produced in this process are typically part of the administrative record.") (unpublished, Ex. D). "[A] complete administrative record should include all materials that 'might have influenced the agency's decision,' and not merely those on which the agency relied in its final decision." *Amfac Resorts v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (quoting *Bethlehem Steel Corp. v. EPA*, 638 F.2d 994, 1000 (7th Cir. 1980)); *see also Dist. Hosp.*

9

*Partners v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013) ("[A]n agency may not skew the record by excluding unfavorable information . . . [n]or may an agency exclude information simply because it did not rely on it for its final decision.") (citations and internal quotations omitted); U.S. Dep't of Justice, Env't and Nat. Res. Div., "Guidance to Federal Agencies on Compiling the Administrative Record," at 3 (Jan. 1999) (explaining that the administrative record should "[i]nclude all documents and materials prepared, reviewed, or received by agency personnel and used by or available to the decision-maker, even though the final decision-maker did not actually review or know about the documents and materials").

Courts often "assume[] the agency properly designated the [a]dministrative [r]ecord absent clear evidence to the contrary." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993). Where, as here, the party moving for completion of the AR provides clear evidence that the record was not properly designated, courts order the agency to remedy the deficiency by adding the missing documents to the record. *E.g.*, *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792–94 (D.C. Cir. 1984) (vacating and remanding to permit supplementation of the record with materials that were considered by the agency but not included in the record lodged with the district court); *Ohio Valley Envtl. Coal.*, 3:02-CV-0059 at 4 ("If the plaintiffs prove that [an agency] has not included information in the administrative record that was considered by the [agency] in making its decision, the court will supplement the record with those materials.") (citing *Walter O. Boswell Mem'l Hosp.*, 749 F.2d at 792–94) (unpublished, Ex. D).

And even where the administrative record is complete, courts may consider evidence outside the record under certain "narrow exceptions," including:

> (1) to explain technical information or action not adequately explained by the record (*e.g.,* more background needed); (2) to show an agency failed to consider

10

Case 2:17-cv-00004-FL   Document 61   Filed 08/28/17   Page 10 of 19

relevant evidence; (3) to show an agency, in bad faith, failed to include certain information in the record; or (4) to demonstrate bad faith in the agency's decision making process.

*Pamlico-Tar River Found. v. U.S. Army Corps of Eng'rs*, 329 F. Supp. 2d 600, 610 (E.D.N.C. 2010). The need to consider extra-record evidence is heightened in NEPA cases. As the Fourth Circuit has explained, "While review of agency action is typically limited to the administrative record that was available to the agency at the time of its decision, a NEPA suit is inherently a challenge to the adequacy of the administrative record . . . [and] . . . [t]hat is why, in the NEPA context, 'courts generally have been willing to look outside the record when assessing the adequacy of an EIS or a determination that no EIS is necessary.'" *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009) (quoting *Webb v. Gorsuch*, 699 F.2d 157, 159 n.2 (4th Cir. 1983) (internal citation omitted)).

> **B.    Documents Regarding the Settlement Negotiations Were Before the Defendants, and The Extra-Settlement Understandings of the Defendants and Defendant-Intervenors Played a Role in the Phase IIb Decision-Making Process.**

According to FHWA, "the documents leading up to the finalization of the [S]ettlement [A]greement are not materials that [FHWA] considered, either directly or indirectly, in reaching a decision. . . . As such, these documents are not properly part of the AR." Ex. B at 1. This conclusory assertion, for which FHWA provides no explanation, defies logic.

The Settlement Agreement was a binding agreement that specified the exact steps that NCDOT, DCM, and FHWA were obligated to take as part of their decision-making process for Phase IIb. With respect to FHWA, the Settlement Agreement required the agency to revise the Phase IIb EA to reflect the switch in the preferred alternative from the Easement Bridge to the Jug-Handle Bridge, and to design both Phase IIa and Phase IIb in order to maintain the option of removing further stretches of highway from the Refuge by building subsequent phases in

Pamlico Sound.[6] RD 16626–30 ¶ 3. Given that FHWA was itself a party to the Settlement Agreement, it strains credulity for FHWA to assert that it did not "consider[], either directly or indirectly," the negotiations leading up to the finalization of the Settlement Agreement. Ex. B at 1. Because these documents determined FHWA's obligations regarding Phase IIb, they were before FHWA and considered by it in its Phase IIb decision-making process. It makes no difference that the settlement negotiations may not have been reviewed by the individual who signed the Phase IIb Record of Decision on behalf of FHWA, because Defendants are required to include in the record all documents directly or indirectly considered by the agency "even though the final decision-maker did not actually review or know about the documents and materials," and "even if they were not specifically considered by the final agency decision-maker." U.S. Dep't of Justice, Env't and Nat. Res. Div., "Guidance to Federal Agencies on Compiling the Administrative Record," at 2–3 (Jan. 1999). Because the settlement negotiations form part of the decision-making process, they were considered by FHWA and thus must be included in the record.

Although the Settlement Agreement may be the final memorialization of the negotiations that preceded it, that is not at all to say that these negotiations were "not considered" by FHWA. To hold that the final product of the settlement negotiations—namely, the Settlement Agreement—is the only settlement-related document within the scope of the AR would be tantamount to claiming that the final product of the NEPA analysis—the Record of Decision—is the only NEPA-related document that is within the scope of the AR. Of course, this would be an absurd proposition, as implicitly conceded by FHWA when it lodged an AR that consists of tens

---

[6] It is indisputable that FHWA was a signatory to the Settlement Agreement, *see* RD 16638 (FHWA signature), despite the misleading characterization by FHWA in its August 7, 2017, letter of "the April 30, 2015, settlement agreement between the Southern Environmental Law Center and the North Carolina Department of Transportation," with no mention that FHWA was a party to the agreement. Ex. B at 1.

of thousands of NEPA-related documents that were created prior to the issuance of the Record of Decision. And as noted above, the record must include "all materials that 'might have influenced the agency's decision,' and not merely those on which the agency relied in its final decision." *Amfac Resorts v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (quoting *Bethlehem Steel Corp. v. EPA*, 638 F.2d 994, 1000 (7th Cir. 1980)).

Not only is it clear that the settlement negotiations were at least indirectly considered by FHWA in its decision-making process, but it is also quite plausible that the Settlement Agreement does not capture the full scope of Defendants' understandings with Defendant-Intervenors regarding the *quid pro quo* bridge exchange. Defendants appear to have realized that the Settlement Agreement posed a legal risk on predetermination grounds. In the 2016 Revised Phase IIb EA, they tried to get out in front of this risk by including a line stating that the Settlement Agreement "did not predetermine the choice of the [Jug-Handle Bridge] Alternative as the Preferred Alternative." RD 23443. Of course, this throwaway line is devoid of any credibility given that the Settlement Agreement explicitly required that the Jug-Handle Bridge be identified as the Phase IIb preferred alternative. But more importantly, this language indicates that Defendants and Defendant-Intervenors negotiated the Settlement Agreement with the understanding that they were potentially running afoul of NEPA's prohibition against predetermination. The following questions regarding the settlement negotiations readily come to mind: Did the parties consider the predetermination case law in drafting the Settlement Agreement? Was the *quid pro quo* agreement even more explicitly detailed in the "confidential negotiations" than in the lone settlement-related document that Defendants have publicly disclosed? Was there discussion of what would happen should the 2016 Revised Phase IIb EA be overturned, and the Jug-Handle Bridge not be completed? All of these questions touch on the

13

Phase IIb decision-making process, and the settlement negotiations are thus properly a part of the record.

Indeed, other documents that were included in the AR illustrate that the negotiations underlying the Settlement Agreement were not just considered by Defendants during the Phase IIb decision-making process; they formed the crux of that decision-making process. For example, in a December 11, 2014 email to a member of the public, NCDOT's former project manager for the Bonner Bridge Replacement Project stated that "any decision on the long-term solution for the Rodanthe area is on hold pending the outcome of" "confidential negotiations between NCDOT and SELC." RD 16238 (email from Beth Smyre to Wes Hutchinson); AR 46894 (email indicating that Beth Smyre is the NCDOT project manager for the Bonner Bridge Replacement Project). *See also* RD 17060 (NCDOT Monthly Design Workshop meeting notes stating that "[t]he project was put on hold in 2013 pending resolution of the Southern Environmental Law Center (SELC) lawsuit against NCDOT" and that "[a] settlement was reached on June 15th, 2015 [*sic*] allowing the project to move forward"). These documents provide "clear evidence" that the settlement negotiations regarding the Bonner Bridge were considered by NCDOT in the Phase IIb decision-making process. And while these documents do not directly reference FHWA, FHWA was indisputably a party to the settlement negotiations given that it was a signatory to the Settlement Agreement. RD 16638; *see also* RD 16774 (NCDOT press release regarding Settlement Agreement in which NCDOT Secretary states, "We appreciate the efforts of ***all parties*** to agree on a viable solution that best serves the people and interests of North Carolina.") (emphasis added). Indeed, FHWA has never represented that it was not a party to settlement negotiations regarding Phase I.

14

The labelling of these negotiations as "confidential" further highlights the fact that the Phase IIb decision-making process was based not an objective analysis fully open to the public, but rather on backroom brokering with private parties—namely, Defendant-Intervenors. Unfortunately for Defendants, any confidentiality agreement that may have restricted the use of the settlement negotiations in the Bonner Bridge lawsuit cannot form the basis of withholding these negotiations from the instant AR, given that they were clearly before FHWA when it approved the Jug-Handle Bridge. To hold otherwise would be to allow FHWA to "skew the record by excluding unfavorable information," thereby only perpetuating Defendants' pattern of defying NEPA by conducting this project beyond the public spotlight. *Dist. Hosp. Partners*, 971 F. Supp. 2d at 20. *See also Ohio Valley Envtl. Coal. v. McCarthy*, 3:15-cv-0271, 2016 WL 2733137 at *4 (S.D. W. Va. May 10, 2016) (ordering EPA to supplement the record with its communications with a state agency regarding the project and explaining that "defendants must supplement the record with any materials unfavorable to [their] decisions, even if [the agency] did not rely on that information in making its final decision.").

Finally, the requested documents are not internal documents but are rather communications between FHWA and other parties—Defendant-Intervenors and NCDOT or other agencies involved in the project. These documents therefore cannot be deemed protected under the attorney-client or deliberative-process privileges. *See* U.S. Dep't of Justice, Environment and Natural Res. Div., "Guidance to Federal Agencies on Compiling the Administrative Record," at 3 (Jan. 1999) (explaining that the administrative record should "[i]nclude communications the agency received from other agencies and from the public, and any responses to those communications").

### C. In the Alternative, the Court Should Order Defendants to Produce the Settlement Negotiations so that the Court May Consider Them as Extra-Record Evidence.

Even if the settlement negotiations were deemed beyond the scope of the complete AR, they should still be considered as extra-record evidence, as they provide material information that may "demonstrate bad faith in the [Defendants'] decision making process" or show that Defendants "in bad faith failed to include certain information in the record." *Pamlico-Tar River Found. v. U.S. Army Corps of Eng'rs*, 329 F. Supp. 2d 600, 610 (E.D.N.C. 2004). One of the primary objectives of NEPA is to "guarantee[] that the relevant information will be made available to [a] larger audience that may . . . play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). In the instant matter, Defendants failed to fulfill their duty to conduct their analysis before a "larger audience," instead making material project commitments via confidential negotiations with private parties. Not only did Defendants conduct their decision-making process largely behind closed doors, but they now persist in their efforts to dodge public scrutiny by lodging an administrative record that is devoid of those confidential negotiations.

The intentionally omitted settlement negotiations would provide color regarding the rationale for Defendants' decision to lock themselves into binding commitments in favor of a specific alternative regarding a project for which the NEPA alternatives process was ostensibly still ongoing. While it is already clear, based on the instant record, that Defendants pre-committed to the Jug-Handle Bridge before completing their purportedly objective review, the negotiations underlying the Settlement Agreement are needed to identify Defendants' basis for signing the Settlement Agreement, and whether Defendants made additional confidential commitments that were omitted from the publicly disclosed Settlement Agreement in order to make the decision-making process appear less predetermined.

The settlement negotiations likely will reveal that the Defendants were guided in their decision to sign the Settlement Agreement not by an objective consideration of the various alternatives, but rather by a desire to clear Defendant-Intervenors' legal roadblocks to the Bonner Bridge replacement. Given the deteriorated nature of the Bonner Bridge, Defendants' frustration with Defendant-Intervenors' stall tactics are understandable. But Defendants' desire to quickly construct a Bonner Bridge replacement did not free them of their obligations to comply with federal law in deciding how to proceed with Phase IIb. Despite the contemporaneous litigation regarding Phase I, Defendants were required to take an objective and reasonable "hard look" before deciding which Phase IIb alternative to pursue. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA does not permit an agency to forego the requisite hard look by simply trading one significant federal action for another.

Instead of complying with the law, Defendants entered into a backroom deal with Defendant-Intervenors pursuant to "confidential negotiations" that Defendants now unconvincingly claim were irrelevant to their decision. RD 16238. To decline to look beyond the record at Defendants' settlement negotiations with Defendant-Intervenors would improperly blind the Court to material facts and allow Defendants to engage in post-hoc rationalizations as to why their decisions were objective and reasonable.

## **CONCLUSION**

For the reasons articulated above, the Court should grant Plaintiffs' motion.

Dated: August 28, 2017

Respectfully submitted,

/s/ Michael K. Murphy
Michael K. Murphy
  D.C. Bar No. 468907
  MMurphy@gibsondunn.com

Bryson C. Smith
  D.C. Bar No. 1025120
  BSmith@gibsondunn.com
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 530-9657
Counsel for Plaintiffs

/s/ Zia C. Oatley_____
Zia C. Oatley
OATLEY LAW
1710 Lake Valley Trail
Chapel Hill, NC 27517
Tel: (202) 550-3332
Fax: (202) 530-9657
Ziacromer@gmail.com
NC Bar No. 44664
Local Civil Rule 83.1 Counsel for Plaintiffs

# CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of August, 2017, I electronically filed a copy of the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing, and pursuant to Local Civil Rule 5.1(e), shall constitute service upon, the following:

John G. Batherson
Colin Justice
North Carolina Department of Justice
1505 Mail Service Center
Raleigh, NC 27699
*Counsel for Defendants North Carolina Department of*
*Transportation and James H. Trogdon, III,*
*in his official capacity as Secretary of NCDOT*

Carter Fleeth Thurman
U.S. Department of Justice
601 D Street NW
Washington, D.C. 20001
*Counsel for Defendants Federal Highway Administration and*
*John F. Sullivan, III, in his official capacity as Division Administrator*
*of FHWA*

Derb S. Carter, Jr.
Kimberley Hunter
Nicholas S. Torrey
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
*Counsel for Defendant-Intervenors Defenders of Wildlife and*
*National Wildlife Refuge Association*

This the 28th day of August, 2017.

/s/ Bryson C. Smith
Bryson C. Smith