IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:17-CV-4-FL

| | | |
|---|---|---|
| SAVE OUR SOUND OBX, INC.; THOMAS ASCHMONEIT; RICHARD AYELLA; DAVID HADLEY; MARK HAINES; JER MEHTA; and GLENN STEVENS, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | MEMORANDUM OPINION |
| NORTH CAROLINA DEPARTMENT OF TRANSPORTATION; JAMES H. TROGDON, III in his official capacity as Secretary of the North Carolina Department of Transportation; FEDERAL HIGHWAY ADMINISTRATION; and JOHN F. SULLIVAN, III, in his official capacity as Division Administrator for the Federal Highway Administration; | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| DEFENDERS OF WILDLIFE; and NATIONAL WILDLIFE REFUGE ASSOCIATION, | ) ) ) | |
| Intervenor-Defendants. | ) | |

This memorandum opinion sets forth reasons for the court's decision entered August 30,

2017, to deny partial motions to dismiss filed by defendants North Carolina Department of

Transportation ("NCDOT") and James H. Trogdon, III ("Trogdon") (collectively "the state

defendants") and intervenor-defendants Defenders of Wildlife and National Wildlife Refuge Association (collectively "the conservation groups").

## STATEMENT OF THE CASE

This action may be characterized as a sequel to Defenders of Wildlife v. North Carolina Dep't of Transp., 762 F.3d 374 (4th Cir. 2014), litigated at the trial level before the undersigned. See Defenders of Wildlife v. North Carolina Dep't. of Transp., 971 F. Supp. 2d 510 (E.D.N.C. 2013). In the prior action, the conservation groups sued the state defendants[1] and defendants Federal Highway Administration ("FHWA") and John F. Sullivan, III ("Sullivan") (collectively "the federal defendants"). See id. The conservation groups challenged aspects of Phase I of a project ("Bonner Bridge replacement project") to replace the aging Herbert C. Bonner Bridge ("Bonner Bridge"), which is a part of North Carolina Highway 12 ("NC 12"). See id. at 518–19. This court entered summary judgment in favor of the state and federal defendants, see id. at 536, which decision the Fourth Circuit affirmed in part, reversed in part, and remanded for further proceedings. See Defenders of Wildlife, 762 F.3d at 403. That action came to a close when the state and federal defendants entered into a settlement agreement with the conservation groups April 30, 2015 ("the April 30, 2015 settlement agreement"). (See DE 28-1).

Plaintiffs initiated this action February 2, 2017, seeking review of decision by the state and federal defendants to approve construction of a "jug-handle" bridge along the Pamlico Sound River, north of Rodanthe, North Carolina, which action would consummate Phase IIb of the Bonner Bridge replacement project. (DE 28 ¶ 1). Plaintiffs amended their complaint as of right March 7, 2017, dropping a claim arising under North Carolina law protested by the state defendants and

---

[1] At the time, Eugene A Conti, Jr. served as Secretary of NCDOT, and was, therefore, named as a defendant.

conservation groups in earlier-filed motions to dismiss.[2]  (DE 28).  On the same day, plaintiffs

moved for preliminary injunction, (DE 29), which motion now is stayed pursuant to this court's

order on joint motion for briefing schedule, (DE 43), as the parties have evidenced agreement that

no preliminary injunction is appropriate at this time where ground-disturbing activities are not

scheduled to commence until March 2018.

Plaintiff Save Our Sound OBX, Inc. ("Save Our Sound") is a non-profit corporation existing

under the laws of North Carolina with its principal place of business in North Carolina.  (DE 28

¶11).  Save Our Sound's mission is to "preserve the Pamlico Sound—including federally protected

waters lying within the presidential proclamation boundary of the Pea Island National Wildlife

Refuge—and its surrounding areas."  (Id.).

The individual plaintiffs are members of Save Our Sound.  (Id. ¶¶ 11-17).  Plaintiffs Thomas

Aschmoneit, David Hadley, Mark Haines, Jer Mehta, and Glenn Stevens own property near the

proposed construction site for the jug-handle bridge, and each individual plaintiff regularly uses the

public lands, wetlands, and waters in and around the Pea Island National Wildlife Refuge ("Pea

Island Refuge").  (Id. ¶¶ 12–17).  The individual plaintiffs' use and enjoyment of the Pea Island

Refuge will be diminished if the jug-handle bridge is constructed.  (Id.).  Moreover, the individual

plaintiffs will suffer diminished property values due to reduced kiteboarding tourism in Rodanthe,

North Carolina if the jug-handle bridge is built.  (Id. ¶ 11).

---

[2] The court invited movants to show cause, where "[i]t is well-settled that an amended pleading ordinarily supercedes the original and renders it of no legal effect," Young v. City of Mount Rainer, 238 F.3d 567 (4th Cir. 2001) (citations omitted), why the court should not terminate as moot defendants' motions to dismiss plaintiffs' original complaint.  Movants separately responded in agreement the motions to dismiss should, in light of plaintiffs amended complaint, be terminated.  Where the state defendants' motion lingers on the docket as pending, the clerk is directed to terminate same.

Defendant FHWA is a federal administrative agency within the United States Department of Transportation, and defendant Sullivan is administrator for the FHWA's North Carolina Division Office. (Id. ¶¶ 18–19). The FHWA is charged with administration of numerous statutes pertaining to domestic road transportation, including statutes governing highway construction projects eligible for federal funding from the National Highway Trust Fund, projects involving construction over protected wildlife preserves, and environmental review of such projects pursuant to the National Environmental Policy Act, 42 U.S.C. § 4331, et seq. ("NEPA"), and Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(a); 23 U.S.C. § 138(a) ("Section 4(f)"). See 49 U.S.C. § 104 (duties of the FHWA).

Defendant NCDOT is a North Carolina administrative agency vested with authority over highway construction within North Carolina, and defendant Trogdon is its Secretary. (DE 28 ¶¶ 20–21). Under federal law, NCDOT constitutes the "state transportation department" bearing responsibility to submit to the Secretary of Transportation any project requiring the Secretary's approval. 23 U.S.C. § 106(a)(1).

Plaintiffs allege that the state and federal defendants approved construction of the jug-handle bridge without proper consideration of environmental consequences and feasible alternatives. Plaintiffs allege in count one that the state and federal defendants have failed to generate and consider a supplemental environmental impact statement as required by NEPA. (DE 28 ¶ 68–72). In count two plaintiffs allege that defendants violated Section 4(f) where the operative reason for state and federal defendants' decision to approve the jug-handle bridge was pre-determined intent to comply with terms of the April 30, 2015 settlement agreement, rather than proper regard of substantive environmental considerations, as mandated by Section 4(f). In both counts, plaintiffs

4

proceed under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq.

Plaintiffs seek declaratory judgment that the state and federal defendants have violated NEPA and Section 4(f) and that their decision to approve the jug-handle bridge project, set forth in a "Record of Decision" issued December 15, 2016 ("2016 Phase IIb ROD") is of no force and effect. Plaintiffs also seek injunction directing compliance with the foregoing environmental laws and other ancillary relief including litigation costs and attorney's fees.

The state defendants move to dismiss as plaintiff Save Our Sound on the ground that it failed to submit comments during the environmental review period as required under the Fixing America's Surface Transportation Act (the "FAST Act"), 42 U.S.C. § 4370m, et seq. The state defendants posit a distinction between the individual plaintiffs in their capacities as members of Save Our Sound (the "member individuals") and the individual plaintiffs appearing in a non-associational capacity (the "singular individuals"). The state defendants concede that the singular individuals timely submitted comments as required by the FAST Act and, thus, are not subject to dismissal. The state defendants contend, however, that the member individuals' comments are untimely, and, for this reason, their APA claims are barred.

The conservation groups move for partial dismissal on other grounds. First, the conservation groups move to dismiss count one of the amended complaint to the extent plaintiffs assert a direct challenge to the sufficiency of a Final Environmental Impact Statement issued in 2008 ("2008 FEIS"). The conservation groups argue that any challenge to the sufficiency of that document is now time-barred. Second, the conservation groups move to dismiss count two of the amended complaint on the ground that plaintiffs lack standing to assert claims arising under Section 4(f)

where plaintiffs fail to allege injury to any interest protected by Section 4(f) and where plaintiffs submitted comments during the environmental review period that failed to place the state and federal defendants on notice of any challenge to the Bonner Bridge replacement project arising under Section 4(f) as required by the FAST Act.

## STATEMENT OF THE FACTS

The facts alleged in the amended complaint viewed in the light most favorable to plaintiffs may be summarized as follows. Bonner Bridge connects Bodie and Hatteras Islands in the Outer Banks. (DE 28 ¶ 39). The southern end of Bonner Bridge lies in Pea Island Refuge, which spans from the northern tip of Hatteras Island to the village of Rodanthe. (See id.). Beginning in the early 1990s, defendants FHWA and NCDOT began to study replacement projects for the aging Bonner Bridge, as well as improvements to sections of NC 12, which endeavors ultimately led to the Bonner Bridge replacement project as it now stands. (Id. ¶¶ 42–62).

The state and federal defendants formed a "NEPA/Section 404 Merger Team" (the "Merger Team") consisting of representatives from FHWA, NCDOT, the U.S. Fish and Wildlife Service, the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, the National Marine Fisheries Service, the National Park Service, the North Carolina Department of Cultural Resources, the North Carolina Wildlife Resources Commission, the North Carolina Department of Environment and Natural Resources ("NCDENR") – Division of Water Quality, the NCDENR – Division of Coastal Management, and the NCDENR – Division of Marine Fisheries to facilitate streamlined decision-making affecting the Bonner Bridge replacement project. (Id. ¶ 41; DE 28-2). Pursuant to a Memorandum of Understanding executed by the members of the Merger Team, once a member indicates "concurrence" at a given point in the overall project, that member of the Merger Team

must abide by the decision subject to concurrence absent circumstances warranting reevaluation. (See DE 28-2 at 2–3).

In September 2008, the 2008 FEIS for the Bonner Bridge replacement project was issued. (DE 28 ¶ 43). The 2008 FEIS included a Final Section 4(f) Evaluation, addressed seven alternatives, and identified the "Parallel Bridge Corridor with Phased Approach/Rodanthe Bridge" as the preferred alternative. (Id.). The 2008 FEIS considered at least one proposal that included a bridge along Pamlico Sound near Rodanthe, but the bridge proposed therein was aligned differently than the jug-handle bridge under review. (Id.). Also among the proposed alternatives were solutions involving beach nourishment (importation of sand into an eroding shoreline) and beach nourishment combined with a bridge within the existing NC 12 easement. (Id. ¶ 44). The 2008 FEIS's analysis pertaining to beach nourishment was conducted in light of shoreline erosion projections based on modeling completed in 2004. (Id.). Although later models of shoreline erosion were eventually developed, no supplement to 2008 FEIS incorporated these updated models. (Id. ¶ 60).

In October 2009, a Revised Final Section 4(f) evaluation was issued, which added and selected a new alternative titled the "Parallel Bridge Corridor with NC-12 Transportation Management Plan." (Id. ¶ 45). This alternative introduced the phased approach to the Bonner Bridge replacement project now in effect. (Id.). Under Phase I, the Bonner Bridge over Oregon Inlet was to be replaced as soon as possible. (Id.). The substance of future phases was left to be determined "based on actual conditions . . at the point in time that additional action becomes necessary." (Id.). Following a May 2010 Environmental Assessment (the "2010 Phase I EA"), which included the Revised Section 4(f) Evaluation as an appendix, a Record of Decision was issued in December 2010 (the "2010 Phase I ROD") approving construction of a replacement bridge over

Oregon Inlet in conformity with the alternative identified in the Revised Final Section 4(f) Evaluation and the 2010 Phase I EA. (Id. ¶¶ 46–47).

In August 2011, Hurricane Irene damaged NC 12 in the Rodanthe S Curves ("S Curves") and within the Pea Island Refuge approximately six miles south of Oregon Inlet. (Id. ¶ 48). In February 2013, an environmental assessment was issued for Phase IIa of the Bonner Bridge replacement project in furtherance of the state and federal defendants' plan to provide long-term improvements at the location of breaches in the Pea Island Refuge caused by the hurricane. A Record of Decision was issued for Phase IIa in October 2013. (Id. ¶ 49).

In December 2013, an Environmental Assessment (the "2013 Phase IIb EA") was issued, which addresses plans to implement long-term improvements along the S Curves. (Id. ¶ 50). The 2013 Phase IIb EA identified four alternatives consisting of the jug-handle bridge, which was ultimately selected, an "Easement Bridge," which would have been situated within the existing NC 12 easement and closely approximate the current path of that highway, beach nourishment, and beach nourishment combined with a bridge within the existing easement. (Id. ¶ 50). These four alternatives are depicted as follows:



(Id.). Although the 2013 Phase IIb EA identified as alternatives beach nourishment and beach nourishment combined with a bridge within the existing NC 12 easement, it summarily rejected these alternatives, stating that the Merger Team already had decided to eliminate them from "detailed study." (Id.). The 2013 Phase IIb EA selected the Easement Bridge (depicted in yellow above) as the preferred alternative. (Id.).

While the foregoing environmental assessments were underway, the conservation groups and defendants engaged in litigation before the undersigned, as described above, which ended as the state and federal defendants entered into the April 30, 2015 settlement agreement. (See DE 28-1).

The settlement agreement required NCDOT to "identify Phase IIb Bridge on New Location as its preferred alternative and seek Merger Team Concurrence Point 3[.]" (Id. at 4). This requirement of the settlement agreement bound the state and federal defendants to seek concurrence from other members of the Merger Team that the jug-handle bridge was the least environmentally damaging practicable alternative ("LEDPA") available to meet the needs of Phase IIb of the Bonner Bridge replacement project. (DE 28 ¶ 53).

The settlement agreement further required that NCEDNR "provide a written statement of its support and preference for the [jug-handle bridge]" and "otherwise . . . use best efforts to help NCDOT attempt to secure Merger Team concurrence." (DE 28-1 at 4–5). In the event that the Merger Team indeed concurred with defendants' support for the jug-handle bridge, the settlement agreement required defendants to "promptly revise" the 2013 Phase IIb EA and Section 4(f) Evaluation to identify the jug-handle bridge as the preferred alternative, and to "[p]ropose to identify the Phase IIb [jug-handle bridge] Alternative as the 'least overall harm' alternative." (Id. at 6). The settlement agreement required the conservation groups to dismiss their suit challenging Phase I only if the jug-handle bridge was identified as the LEDPA, and the conservation groups covenanted not to file suit regarding Phase IIb only if the jug-handle bridge was identified as the LEDPA and chosen as the selected alternative. (DE 28 ¶ 55).

On June 17, 2015, the Merger Team identified the jug-handle bridge as the LEDPA. (Id. ¶ 56). Following dismissal of the conservation groups' prior action, construction for the Bonner Bridge replacement project commenced on March 8, 2016. (Id.). On May 24, 2016, the state and federal defendants issued the 2016 Revised Phase IIb EA, in which the state and federal defendants identified as the preferred alternative for Phase IIb the jug-handle bridge in issue here despite the

fact that a similar bridge previously was rejected in the 2013 Phase IIb EA.  (Id. ¶ 60).  The 2016

Revised Phase IIb EA cites no new studies for diverging from previous decision to select the

easement bridge as set forth in the 2013 Phase IIb EA; however, the 2016 Revised Phase IIb EA

offers as partial explanation that it "takes into account" the settlement agreement between defendants

and the conservation groups.  (Id.).

Plaintiffs submitted comments to the 2016 Revised Phase IIb EA raising objections to the

Merger Team's selection of the jug-handle bridge as the Phase IIb alternative.  (Id. ¶ 61).  On

December 15, 2016, the Merger Team issued the 2016 Phase IIb ROD, which approved the jug-

handle bridge as the selected alternative and officially allowed NCDOT to proceed with

construction.  (Id. ¶ 62).  This action followed.

## DISCUSSION

A.     Standard of Review

A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction, and the petitioner

bears the burden of showing that federal jurisdiction is appropriate when challenged by the

respondent.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Adams v. Bain,

697 F.2d 1213, 1219 (4th Cir. 1982).  Such a motion may either 1) assert the complaint fails to state

facts upon which subject matter jurisdiction may be based, or 2) attack the existence of subject

matter jurisdiction in fact, apart from the complaint.  Adams, 697 F.2d at 1219.  Under the former

assertion, the moving party contends that the complaint "simply fails to allege facts upon which

subject matter jurisdiction can be based."  Id.  In that case, "the [petitioner], in effect, is afforded the

same procedural motion as he would receive under a Rule 12(b)(6) consideration."  Id.  "[A]ll facts

alleged in the complaint are assumed true, and the motion must be denied if the complaint alleges

sufficient facts to invoke subject matter jurisdiction." Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). When the defendant challenges the factual predicate of subject matter jurisdiction, a court "may then go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations" without converting the matter to summary judgment. Adams, 697 F.2d at 1219; Kerns, 585 F.3d at 192.

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of the complaint but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). A complaint states a claim if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007)). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [the] evidence" required to prove the claim. Twombly, 550 U.S. at 556.

In evaluating the complaint, "[the] court accepts all well-plead facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.     Analysis

1.     Comments Under the FAST Act

The state defendants move pursuant to Rule 12(b)(1) to dismiss plaintiff Save Our Sound and the individual plaintiffs insofar as they appear as members of Save Our Sound on the ground that the foregoing plaintiffs lack standing to challenge the 2016 Revised Final EA where they failed to raise objections to the 2016 Revised Final EA during the comment period.  While not objecting to timeliness, the conservation groups move to dismiss plaintiffs claims pertaining to Section 4(f) for lack of standing on the ground that plaintiffs' comments did not give sufficient notice of plaintiffs' intent to seek judicial review arising under Section 4(f).

"A person . . . adversely affected by agency action within the meaning of a relevant statute[,]" 5 U.S.C. § 702, who otherwise has Article III standing may bring an action pursuant to the judicial review provisions of the APA, id. § 701, et seq., to challenge "final agency action[.]" Id. § 704.  On review pursuant to the APA, "[t]he reviewing court shall . . . hold unlawful and set aside any agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The scope of "arbitrary and capricious" review is narrow, but the court must ensure that "the agency examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see N.C. Wildlife Fed'n v. N.C. Dep't of Transp., 677 F.3d 596, 601 (4th Cir. 2012) (The court "must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action, and must not reduce itself to a rubber-stamp of agency action.") (internal citations and quotation marks omitted ); see also

13

Shenandoah Valley Network v. Capka, 669 F.3d 194, 196 (4th Cir. 2012) ("Claims arising under NEPA are subject to judicial review pursuant to the [APA]."); Hickory Neighborhood Def. League v. Skinner, 893 F.2d 58, 61 (4th Cir. 1990) (applying APA standards when considering a claim pursuant to Section 4(f)).

The FAST Act restricts the scope of the APA, limiting availability of judicial review of certain projects affected by NEPA to only those individuals who submit comments during the administrative decision-making process, as follows:

> judicial review of any authorization issued by a Federal agency for a covered project shall be barred unless– . . . (B) in the case of an action pertaining to an environmental review conducted under NEPA–
>
> > (i) the action is filed by a party that submitted a comment during the environmental review; and
> >
> > (ii) any commenter filed a sufficiently detailed comment so as to put the lead agency on notice of the issue on which the party seeks judicial review . . .

42 U.S.C. 4370m-6(a) (emphasis added). The FAST Act defines a "covered project" to include "any activity in the United States that requires authorization or environmental review by a federal agency involving construction" of nine specific categories of infrastructure development including, in relevant part, "surface transportation." 42 U.S.C. § 4370m(6)(A). "The term 'covered project' does not include . . . any project subject to section 139 of Title 23" ("Section 139"). Id. § 4370m(6)(B).

Section 139 establishes procedures to facilitate expeditious environmental review pursuant to NEPA in transportation projects that require cooperation among multiple agencies. See 23 U.S.C. § 139(b)(3)(A) (directing the Secretary of Transportation to "allow for the use of programmatic approaches to conduct environmental reviews that" generate efficiencies on multiple metrics). Projects regulated under Section 139 include "any highway project . . . that, if implemented as

14

proposed by the project sponsor, would require approval by any operating administration or secretarial office within the Department of Transportation." Id. §139(a)(6)(A). "The term 'highway' includes– (B) a . . . bridge . . ." 23 U.S.C. 101(a)(11). Among projects requiring approval of the Secretary of Transportation are "project[s] . . . which require[] the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local official having jurisdiction thereof . . ." 23 U.S.C. § 138(a).

Plaintiffs allege that part of the jug-handle bridge is planned to extend through the Pea Island Refuge. (DE 28 ¶ 40). Therefore, Phase IIb of the Bonner Bridge replacement project requires the approval of the Secretary of Transportation. 23 U.S.C. § 138(a). Thus, where the Bonner Bridge replacement project is a highway project requiring approval of a secretarial office of the Department of Transportation, it is subject to Section 139. See id. Accordingly, the Bonner Bridge replacement project is not a "covered project" under provisions of the FAST Act limiting availability of the judicial review only to those individuals who submitted comments during the NEPA comment period. See 42 U.S.C. 4370m(6)(b). For this reason, plaintiffs are not barred from this litigation where timely submission of comments is not a prerequisite to judicial review in matters of this nature. See id. Where the state defendants seek dismissal solely on the basis of plaintiffs' failure to submit timely comments, the state defendants' motion is, thus, denied.

The conservation groups argue that even if plaintiffs' comments were timely, plaintiffs remain barred from participation in this litigation where comments submitted make no specific reference to violations based upon Section 4(f). See 42 U.S.C. § 4370m-6(a)(ii). However, as set forth above, NEPA establishes submission of comments during the review period as a prerequisite for judicial

review only for "covered projects" as defined in the statute. Id. § 4370m-6(a). Therefore, where the project in issue here is not a "covered project" for purposes of NEPA's judicial review provisions, plaintiffs' failure to mention by name Section 4(f) in their comments does not preclude judicial review, and the conservation groups' motion to dismiss, to the extent it rests on this ground, is denied. See id.

2.      Adequacy of Plaintiffs' Section 4(f) Interest

The conservation groups move to dismiss plaintiffs' claims arising under Section 4(f) on the ground that plaintiffs have failed to plead an injury that falls within the zone of interests protected by Section 4(f). "The Administrative Procedure Act grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'" Ass'n. of Data Processing Service Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970) (citing 5 U.S.C. § 702). Standing extends only to plaintiffs whose injuries 'fall within the zone of interests protected by the law invoked." Lexmark Intern., Inc. v. Static Control Components, Inc., 134 S. Ct. 1337, 1388 (2014). This test is not "especially demanding[,]" where the Court often has "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff[.]" Id. at 1389. The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." Id. "Interests" for purposes of standing may include economic interests, as well as "aesthetic, conservational, and recreational" interests. Sierra Club v. Morton, 405 U.S. 727, 738 (1972).

The purpose of Section 4(f) is to "preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, or historic sites," unless an agency

demonstrates that there is no feasible and prudent alternative to the use of a Section 4(f) site and that the agency has done all possible planning to minimize harm to the site. 49 U.S.C. §§ 303(a)–(c). The court evaluates plaintiffs' standing through the lens of these protected interests.

Each individual plaintiff alleges that he or she "makes regular use and enjoyment of[] the public lands, wetlands, and waters in and around the Pea Island National Wildlife Refuge," and that the jug-handle bridge, if constructed, will "diminish" his or her "use and enjoyment of" areas "including the [Pea Island] Refuge." Likewise, plaintiff Save Our Sound, alleges that its members "make regular use and enjoyment of[] the public lands, wetlands, and waters in and around the Pea Island National Wildlife Refuge" and that the jug-handle bridge "will decrease members' . . . use and enjoyment of their property and surrounding areas, including the [Pea Island] Refuge." (DE 28 ¶ 11).

Where the foregoing allegations indicate that the individual plaintiffs' enjoyment of the Pea Island Refuge may be diminished if the jug-handle bridge is constructed through the Pea Island Refuge, said allegations state aesthetic, conservational, and recreational interests in "preserv[ation] of the natural beauty of . . . [the Pea Island] wildlife and waterfowl refuge" as protected by Section 4(f). Therefore, the complaint alleges facts sufficient to support the individual plaintiffs' standing to assert the claims in issue here where the individual plaintiffs assert injuries based upon actions affecting property protected by Section 4(f). See Lexmark, 134 S.Ct. at 1388.

An organization has standing to seek redress for the injuries of its members if three elements are satisfied. Hunt v. Washington State Apple Advertising Comm'n., 432 U.S. 333, 343 (1977); United Food and Commercial Workers Union Local 751 v. Brown Grp, Inc., 517 U.S. 544, 555 (1996). First, an organization's membership must "include at least one member with standing to present, in his or her own right, the claim (or type of claim) pleaded by the [organization.]" Local

751, 417 U.S. at 555; see <u>Sierra Club</u>, 405 U.S. at 735 (1972) (plaintiff lacked standing where it failed to allege that "it or its members would be affected in any of their activities or pastimes by the [challenged] development."). Second, an organization must "be organized for a purpose germane to the subject of its member's claim . . . " <u>Local 751</u>, 417 U.S. at 555. Third, an organization may assert only those claims and seek such relief as does not "require[] the participation of individual members in the lawsuit." <u>Hunt</u>, 432 US. at 343.

As set forth above, the individual plaintiffs, each of whom is a member of Save Our Sound, have standing to assert the claims at issue here; therefore, Save Our Sound's membership includes at least one individual "with standing to present, in his or her own right, the claim[s] pleaded by" Save Our Sound. <u>See Local 752</u>, 417 U.S. at 555. Next, Save Our Sound alleges that its "mission is to preserve the Pamlico Sound—including federally protected waters lying within the presidential proclamation boundary of the Pea Island National Wildlife Refuge—and its surrounding areas." Where construction of the jug-handle bridge as described in the complaint implicates Save Our Sound's alleged mission to preserve the Pamlico Sound and its surrounding areas, and where the Pea Island Refuge lies within the area surrounding the Pamilico Sound, Save Our Sound has asserted claims of injury germane to its purpose and protected by Section 4(f). <u>See id.</u> Finally, the complaint suggests no basis to conclude that claims asserted by Save Our Sound "require[] the particpation of individual members in the lawsuit." <u>See Hunt</u>, 432 U.S. at 343. Therefore, where all three elements of organizational standing are satisfied, and where Save Our Sound asserts claims of injury based upon property affected by Section 4(f), facts alleged in the complaint support conclusion that Save Our Sound has standing to proceed in this action. <u>See id</u>; <u>Lexmark</u>, 134 S.Ct. at 1388.

The conservation groups advance several arguments in support of their contention that plaintiffs' claims lie outside the zone of interests protected by Section 4(f). First, the conservation groups argue that plaintiffs' claims of diminished use and enjoyment of areas including the Pea Island Refuge are conclusory and, therefore, are entitled to no presumption of veracity under the standard of review applicable to motions for dismissal pursuant to Rule 12(b)(6). However, this argument fails because, although plaintiffs' allegations of diminished enjoyment of the Pea Island Refuge are set forth in no great detail, the allegations are neither mere "legal conclusions, elements of a cause of action [nor], . . . bare assertions devoid of further factual enhancement." See Nemet Chevrolet, 591 F.3d at 255. Rather, read in the light most favorable to plaintiffs, the complaint includes allegations that plaintiffs use and enjoy the Pea Island Refuge in its current from for aesthetic, conservational or recreational reasons, and that the value of the Pea Island Refuge as judged by these metrics will be materially diminished if the jug-handle bridge is constructed through the Pea Island Refuge lands. (See DE 28 ¶¶ 11–17).

Second, the conservation groups contend that plaintiffs' have failed to allege that the jug-handle bridge would harm the Pea Island Refuge. In particular, the conservation groups argue that, under the existing Phase IIb plan, a net 16.48 acres will be returned to the Pea Island Refuge where parts of the NC 12 highway easement will be returned to the Refuge. This argument fails because the relevant standing inquiry is whether the complaint alleges a cognizable injury sustained by plaintiffs. That is, plaintiffs are not required to plead injury to the legal interests of the Pea Island Refuge in order to establish their own standing. See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 491 (1982) (discussing the nature of an Article III injury in fact, "[a]t the core is the irreducible minimum that persons seeking judicial

relief from an Art. III court have 'such a <u>personal stake</u> in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends. . . .") (emphasis added) (citing <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962)).

Third, the conservation groups contend that plaintiffs have alleged injury only to the waters surrounding the Pea Island Refuge, which waters, the conservation groups assert, are not part of the Pea Island Refuge itself. However, this argument fails where, as set forth above, plaintiffs have alleged injuries based upon plaintiffs' use of lands within the Pea Island Refuge. (<u>See</u> DE 28 ¶ 11 ("Save Our Sound and its members will be irreparably harmed by construction of the proposed [j]ug-[h]andle [b]ridge, which will decrease members' property values and diminish members' use and enjoyment of their property <u>and surrounding areas, including the [Pea Island] Refuge</u>.") (emphasis added)).

Finally, the conservation groups assert that plaintiff Save Our Sound lacks standing where it has failed to establish that "the interests it seeks to protect are germane to [its] purpose." <u>See</u> <u>Am. Canoe Ass'n v. Murphy Farms, Inc.</u>, 326 F.3d 505, 517 (4th Cir. 2003); <u>Local 751</u>, 417 U.S. at 555. In particular, the conservation groups contend that where Save Our Sound's articles of incorporation do not mention the Pea Island Refuge as a subject of its advocacy, plaintiffs have failed to demonstrate that the instant action is germane to Save Our Sound's mission. However, this argument fails where, as set forth above, plaintiff Save Our Sound's mission to preserve the Pamlico Sound waters and surrounding areas indeed embraces advocacy pertaining to projects that may cause harm to its members based upon actions affecting the Pea Island Refuge. Although Save Our Sound's articles of incorporation emphasize the Pamlico Sound waters as its main focus of concern, that fact does nothing to undermine Save Our Sound's allegations, which here must be accepted as true, that

its mission extends to seeking preservation of the areas surrounding the Pamlico Sound, including the Pea Island Refuge. (See DE 28 ¶ 11); Nemet Chevrolet, 591 F.3d at 255.

For the foregoing reasons, to the extent the conservation groups' motion to dismiss rests upon assertion that plaintiffs' claims lie outside the zone of interests protected by Section 4(f) and upon argument that claims asserted in the complaint are not germane to plaintiff Save Our Sound's mission, the motion is denied.

### 3. Reviewability of NEPA Documents

The conservation groups move for partial dismissal to the extent plaintiffs challenge documents generated pursuant to NEPA review which are no longer reviewable due to time limits. As set forth above, "[a] person . . . adversely affected by agency action within the meaning of a relevant statute[,]" 5 U.S.C. § 702, who otherwise has Article III standing may bring an action pursuant to the judicial review provisions of the APA, id. § 701, et seq., to challenge "final agency action[.]" Id. § 704. An agency action is "final" if two conditions are satisfied. Bennett v. Spear, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agnecy's decisionmaking process . . . [a]nd second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]" Id. at 177–78.

NEPA institutes a set of procedural requirements that facilitate information-gathering pertaining to environmental consequences of government action. See 42 U.S.C. § 4332. Of relevance here, NEPA requires that "all agencies of the Federal Government shall . . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" a detailed environmental impact statement ("EIS") assessing in detail:

(i)     the environmental impact of the proposed action,

(ii)    any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii)   alternatives to the proposed action,

(iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Id. § 4332(C).  An EIS developed pursuant to NEPA must be made available to the President, appropriate government agencies, the public, and must "accompany the proposal through the existing agency review processes."  Id.

The requirements of NEPA are "essentially procedural."  Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227 (1980).  "NEPA was designed to insure a fully informed and well-considered decision, but not necessarily a decision [the judiciary] would have reached . . ."  Id.  Accordingly, although it mandates no particular outcomes of the administrative process, NEPA requires that "agencies take a hard look at environmental consequences" where such consequences are illuminated by the required EIS.  Robertson v. Methow Valley Citizens Council., 490 U.S. 332, 350 (1989).

When new information arises after preparation of an EIS, agencies may be required to produce a supplemental EIS to incorporate that information.  See Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 371 (1989) ("It would be incongruous with [NEPA's] approach to environmental protection, and with [NEPA's] manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial

22

approval."). In particular, agencies must "prepare supplements to either draft or final EIS's if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Id. at 372 (citing 40 C.F.R. 1502.9(c)).

FHWA regulations provide additional guidelines for NEPA compliance in actions under FHWA jurisdiction. 23 C.F.R. § 771.109(a)(1). The regulations provide "[a] draft EIS, final EIS, or supplemental EIS may be supplemented at any time. An EIS shall be supplemented whenever the [FHWA] determines that: . . . (2) [n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS." Id. § 771.130(a). To determine whether a supplemental EIS is necessary "[a]n [Environmental Assessment] shall be prepared by the applicant in consultation with the [FHWA] for each action that . . . does not clearly require the preparation of an EIS, or where the [FHWA] believes an EA would assist in determining the need for an EIS." Id. § 771.119(a).

The complaint alleges that the 2016 Phase IIb ROD constitutes the document in which the state and federal defendants rendered their final decision to select the jug-handle bridge as the preferred alternative for Phase IIb of the Bonner Bridge replacement project. (DE 28 ¶ 62). Accordingly, where the complaint alleges that issuance of the 2016 Phase IIb ROD "mark[s] the consummation of the [state and federal defendants'] decisionmaking project[,]" Bennett, 520 U.S. at 177–78, and where it is readily apparent from the complaint that legal consequences flow from that decision, namely, authoritative permission to construct the jug-handle bridge, see id., issuance of the 2016 Revised Phase IIb EA constitutes "final agency action" subject to judicial review under the APA. See id. Therefore, where, as set forth above, plaintiffs have otherwise demonstrated standing, plaintiffs are entitled to seek review under the APA of the state and federal defendants'

decision to approve the jug-handle bridge.  <u>See</u> 5 U.S.C. § 701, <u>et seq.</u>  The scope of such review may embrace any facts upon which the decisionmaking agencies relied in reaching their decision to approve the jug-handle bridge, including examination of the 2008 FEIS and any other documents relied upon to justify conclusions set forth in the 2016 Revised  Phase IIb ROD.  <u>See</u> <u>Motor Vehicle Mfr's.</u>, 463 U.S. at 43 ("the agency must examine the relevant data . . .").

The conservation groups move for partial dismissal on the ground that plaintiffs are time-barred from asserting a direct challenge to the 2008 FEIS.  <u>See</u> 23 .S.C. § 193(*l*)(1).  This argument fails because although the complaint suggests that supplementation to the 2008 FEIS may prove necessary if this court determines that the state and federal defendants' decisions not to supplement to the 2008 FEIS and to approve the jug-handle bridge were unjustified in light of APA principles, the complaint includes no direct challenge to the 2008 FEIS itself.  Rather, the complaint challenges the state and federal defendants' final decision to approve the jug-handle bridge as set forth in the 2016 Phase IIb ROD. (<u>See</u> DE 28 at 25 ¶ B (prayer for relief requesting declaration that the 2016 Phase IIb ROD is unlawful and of no effect)).  Therefore, to the extent the conservation groups' motion seeks to block a direct challenge to the 2008 EIS, the motion is denied.

In sum, the state defendants' partial motion to dismiss based upon claimed untimeliness of plaintiffs' comments is denied where submission of comments is no prerequisite to judicial review in actions of this nature.  The conservation groups' partial motion to dismiss is denied for the same reason and, in addition, because plaintiffs adequately have alleged injury falling within the zone of interests protected by Section 4(f) and because the scope of plaintiffs' challenge is properly limited to reviewable documents.

For the reasons set forth herein, the court denied defendants' motions.

This the 5th day of September, 2017.


                                    LOUISE W. FLANAGAN
                                    United States District Judge