**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
NO. 2:17-CV-00004-FL**

| | |
|---|---|
| **SAVE OUR SOUND OBX, INC., THOMAS ASCHMONEIT, RICHARD AYELLA, DAVID HADLEY, MARK HAINES, JER MEHTA, and GLENN STEVENS,**<br><br>       **Plaintiffs,**<br><br>   **v.**<br><br>**NORTH CAROLINA DEPARTMENT OF TRANSPORTATION, JAMES H. TROGDON, III, in his official capacity as Secretary of the North Carolina Department of Transportation, FEDERAL HIGHWAY ADMINISTRATION, and JOHN F. SULLIVAN, III, in his official capacity as Division Administrator for the Federal Highway Administration,**<br><br>       **Defendants,**<br><br>**and**<br><br>**DEFENDERS OF WILDLIFE and NATIONAL WILDLIFE REFUGE ASSOCIATION,**<br><br>       **Defendant-Intervenors.** | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

Page

NATURE OF THE CASE ................................................................................................1

FACTUAL BACKGROUND ..........................................................................................4

    I.      Project History ........................................................................................4

    II.     Bonner Bridge Suit Settlement Agreement.............................................9

    III.    Phase IIb – The Rodanthe Project.........................................................11

STANDARD OF REVIEW ..........................................................................................14

STANDING ..................................................................................................................15

ARGUMENT ...............................................................................................................17

    I.      Defendants Violated NEPA by Biasing Their Analysis in Favor of the Jug-Handle Bridge. ..............................................................................17

    II.     Defendants Acted Arbitrarily and Capriciously by Failing to Disclose and Analyze the Effects of the Jug-Handle Bridge. ....................................21

          A.     Defendants Must Analyze Environmental Impacts and Provide Protection for Protected Land and Historic Property................................22

          B.     Defendants Violated NEPA, Section 4(f), and Section 106 by Failing to Adequately Evaluate the Impacts of the Construction Process. ...................................................................................24

               1.     The failure to disclose and evaluate the effects of the haul roads constitutes a violation of NEPA. ...........................................25

               2.     The failure to evaluate the effects of the haul roads constitutes a violation of Section 4(f). ...........................................26

               3.     The failure to evaluate the effects of the haul roads constitutes a violation of Section 106. ...........................................27

               4.     Defendants' failure to consider the impacts of the construction process are not cured by FHWA's claims that the construction diagrams were created after the Phase IIb ROD was issued.............................................................28

Page

C.    Defendants Violated Section 4(f) by Failing to Properly Analyze
the Effects of Phase IIb on the Pea Island National Wildlife
Refuge. .....................................................................................................30

1.    Defendants failed to properly evaluate the effects of Phase
IIb on the Refuge in light of the Fourth Circuit's decision in
the Bonner Bridge Suit.................................................................30

D.    Defendants Violated NEPA by Failing to Adequately Consider the
Socioeconomic Impacts of the Project.......................................................32

III.    Defendants Violated NEPA by Failing to Reevaluate Beach Nourishment
as a Phase IIb Alternative in Light of Significant New Circumstances and
Information. .................................................................................................35

A.    Material New Information Has Rendered Obsolete the Reasons for
Eliminating Beach Nourishment from Detailed Study. ............................35

1.    Defendants failed to consider material new information
regarding suitable sand sources. ..................................................38

2.    Defendants failed to consider material new information
regarding the cost of beach nourishment. ....................................39

3.    Defendants failed to consider material changes in
shoreline-erosion projections.......................................................41

B.    Defendants' Failure to Issue a Supplemental EIS in Light of this
Material New Information Is a Violation of NEPA...................................42

C.    Regardless of Whether They Were Required to Issue a
Supplemental EIS, Defendants Violated NEPA by Failing to Take
a Hard Look at Whether to Reevaluate Beach Nourishment as a
Phase IIb Alternative.................................................................................46

D.    Defendants Violated Section 4(f) by Failing to Consider
Avoidance Alternatives and Failing to Select the Least Overall
Harm Alternative. .....................................................................................46

CONCLUSION.....................................................................................................48

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ..................................................................................................15

*Citizens' Comm. to Save Our Canyons v. Krueger*,
    513 F.3d 1169 (10th Cir. 2008) .............................................................................26

*Defs. of Wildlife v. N.C. Dep't of Transp.*,
    762 F.3d 374 (4th Cir. 2014) ........................................................................ *passim*

*Defs. of Wildlife v. N.C. Dep't of Transp.*,
    971 F. Supp. 2d 510 (E.D.N.C. 2013)......................................................................5

*Fayetteville Area Chamber of Commerce v. Volpe*,
    515 F.2d 1021 (4th Cir. 1975) ...............................................................................17

*Grand Canyon Tr. v. FAA*,
    290 F.3d 339 (D.C. Cir. 2002)...............................................................................22

*Hughes River Watershed Conservancy v. Glickman*,
    81 F.3d 437 (4th Cir. 1996) ...................................................................................43

*Hughes River Watershed Conservancy v. Johnson*,
    165 F.3d 283 (4th Cir. 1999) .................................................................................14

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)...............................................................................................16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014)...........................................................................................15

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989).........................................................................................45, 46

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) .........................................................................18, 21

*Narragansett Indian Tribe v. Warwick Sewer Auth.*,
    334 F.3d 161 (1st Cir. 2003)..................................................................................24

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,
    677 F.3d 596 (4th Cir. 2012) .................................................................................14

*N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.*,
    151 F. Supp. 2d 661 (M.D.N.C. 2001) ..................................................................44

Case 2:17-cv-00004-FL   Document 96   Filed 01/10/18   Page 4 of 55

*Piedmont Envtl. Council v. F.E.R.C.*,
  558 F.3d 304 (4th Cir. 2009) ................................................17

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ........................................................ *passim*

*S.C. Wildlife Fed'n v. S.C. Dep't of Transp.*,
  485 F. Supp. 2d 661 (D.S.C. 2007) ........................................14

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) .......................................................16

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996) .......................................................16

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) .......................................................21

*W. N.C. All. v. N.C. Dep't of Transp.*,
  312 F. Supp. 2d 765 (E.D.N.C. 2003) ....................................42

*Wash. Cty. v. U.S. Dep't of Navy*,
  317 F. Supp. 2d 626 (E.D.N.C. 2004) ..........................17, 18, 20

## Statutes

5 U.S.C. § 706(2)(A) ..........................................................14

5 U.S.C. § 706(2)(D) ..........................................................14

49 U.S.C. § 303(a) ............................................................22

49 U.S.C. § 303(c) ............................................................23

49 U.S.C. § 303(c)(2) .........................................................27

54 U.S.C. § 300101(1) ........................................................23

54 U.S.C. § 300308 ........................................................23, 27

54 U.S.C. § 306108 ......................................................23, 27, 28

## Regulations

23 C.F.R. § 774.3(c) ..........................................................27

Page(s)

23 C.F.R. § 774.3(c)(1) ................................................................................20, 23, 47, 48

23 C.F.R. § 774.11(i) ...................................................................................................30

23 C.F.R. § 774.17 ..................................................................................................23, 27

36 C.F.R. § 800.16(y) ............................................................................................24, 27

40 C.F.R. § 1500.1(b) ...................................................................................................17

40 C.F.R. § 1501.4(e) ...................................................................................................22

40 C.F.R. § 1501.7(a)(1) ..............................................................................................37

40 C.F.R. § 1501.7(c) ..............................................................................................37, 42

40 C.F.R. § 1502.1 ........................................................................................................17

40 C.F.R. § 1502.2(f) ....................................................................................................17

40 C.F.R. § 1502.2(g) ...................................................................................................17

40 C.F.R. § 1502.9(c)(1) ...............................................................................................42

40 C.F.R. §§ 1502.9(c)(1)(i)–(ii) ..................................................................................35

40 C.F.R. § 1502.9(c)(1)(ii) ..........................................................................................37

40 C.F.R. § 1502.14 ......................................................................................................17

40 C.F.R. § 1502.14(a) ............................................................................................35, 46

40 C.F.R. § 1508.14 ................................................................................................32, 34

40 C.F.R. § 1508.27 ......................................................................................................25

40 C.F.R. § 1508.27(b)(3) .......................................................................................25, 26

40 C.F.R. § 1508.27(b)(8) .......................................................................................25, 26

**Rules**

FED. R. CIV. P. 56(a) .....................................................................................................14

## NATURE OF THE CASE

Defendants violated federal law in their approval of the Jug-Handle Bridge along North Carolina Highway 12 ("NC-12") in Rodanthe.[1] NEPA requires agencies to take a hard look at the environmental consequences of major federal actions, and to analyze reasonable alternatives. That did not happen here. Instead, Defendants merely papered the file to justify their predetermined choice of the Jug-Handle Bridge.

Before selecting the Jug-Handle Bridge, the North Carolina Department of Transportation ("NCDOT") and the Federal Highway Administration ("FHWA") entered into a binding settlement with the Southern Environmental Law Center ("SELC") and its clients that required the agencies to alter their course of action for the Rodanthe project and pursue the Jug-Handle Bridge alternative. Before this settlement, the agencies had identified a different preferred alternative for the Rodanthe project—a bridge in the current highway easement instead of one swinging out into Pamlico Sound. The settlement enabled NCDOT and FHWA to begin work on the related (and in their view more urgent) Bonner Bridge replacement, which had been held up by the original SELC lawsuit. In exchange, SELC received a commitment that the agencies would advance the Jug-Handle Bridge for the Rodanthe project.

The SELC litigation settlement constitutes unlawful predetermination. Agencies cannot commit to a set course of action to satisfy the narrow interests of a private party, and then rubber stamp that decision with NEPA documents issued after the fact. Here, the settlement with SELC obligated two North Carolina agencies—NCDOT and the North Carolina Department of

---

[1] Plaintiffs have chosen to use the term "Jug-Handle Bridge" to describe the alternative selected for the Rodanthe project in the 2016 Phase IIb Record of Decision that is under review in this litigation. RD 28613. At various points in the Administrative Record, the Jug-Handle Bridge is also called the Phase IIb Bridge on New Location.

Environment and Natural Resources ("NCDENR")—to designate the Jug-Handle Bridge as the least environmentally damaging practicable alternative (the "LEDPA"), and required FHWA to support this designation. Defendants and SELC have suggested that because other agencies subsequently agreed to the designation of the Jug-Handle Bridge as the LEDPA, that decision was not predetermined. But they ignore the fact that if all agencies did not agree on which alternative to designate as the LEDPA, the LEDPA decision would be referred to a dispute panel of the four lead agencies, three-fourths of which consisted of the agencies who signed the settlement. So the question of whether the settlement would result in the Jug-Handle Bridge being selected was never in doubt—the settlement agreement required the settling agencies to exercise their veto power to overrule the designation of any other alternative as the LEDPA in the Merger Team process. And because federal law requires that only the "least overall harm" alternative may be selected, the designation of the Jug-Handle Bride as the LEDPA precluded the selection of any other alternative for the Rodanthe project. To put it bluntly, the fix was in the moment the settlement was signed.

Everything that happened after the SELC settlement must be viewed through that lens. The lead agencies had committed to supporting the Jug-Handle Bridge, and keeping SELC happy was the best way to avoid further litigation. *See* RD 25194 (internal NCDOT email reporting the "[g]ood news" that "SELC is happy with the Revised EA" and would not sue as long as the Jug-Handle Bridge was chosen as the selected alternative). To complete this plan, the agencies issued an Environmental Assessment to approve the Jug-Handle Bridge *tout de suite*, relying heavily on the assumption that an earlier Final Environmental Impact Statement completed in 2008 for the Bonner Bridge Replacement Project adequately studied the environmental impacts

of the new Jug-Handle Bridge. It did not. The EA and Record of Decision for the Jug-Handle Bridge are therefore inadequate, and arbitrary and capricious.

Specifically, NCDOT and FHWA violated NEPA, Section 4(f) of the Department of Transportation Act ("Section 4(f)"), and Section 106 of the National Historic Preservation Act ("Section 106") by failing to disclose and evaluate a range of impacts of the Jug-Handle Bridge. Among the impacts that were not adequately analyzed are the impacts of transporting construction materials throughout the course of the three-plus-year process of building the Jug-Handle Bridge; the impacts of the Jug-Handle Bridge on the Pea Island National Wildlife Refuge; and the socioeconomic impacts of the Jug-Handle Bridge on the community of Rodanthe.

Defendants further violated NEPA by prematurely eliminating beach nourishment as a reasonable alternative to the Jug-Handle Bridge. Sources of sand, shoreline-erosion projections, and demonstrated successes of other nourishment projects should have been studied and analyzed. Indeed, material new information rendered obsolete the premises underlying the initial decision to eliminate beach nourishment from consideration in the first place. Similarly, by failing to analyze beach nourishment in the Section 4(f) Evaluation for the Rodanthe project, Defendants failed to properly analyze which alternative poses the least overall environmental harm, as required by Section 4(f).

In order to cure the multitude of flaws in Defendants' approval of the Jug-Handle Bridge, Plaintiffs respectfully request that the Court invalidate the existing Record of Decision that approved the Jug-Handle Bridge, and order Defendants to fully evaluate the project's alternatives and impacts in light of current information—this time in an Environmental Impact Statement

coordinated in full view of the public and without any premature commitments made pursuant to confidential negotiations with private parties.

**FACTUAL BACKGROUND**

**I.    Project History**

NC-12 runs north-to-south along the Outer Banks of North Carolina.  AR 57226.  The Bonner Bridge, which was completed in 1963, spans Oregon Inlet and connects Bodie Island to Hatteras Island.  AR 57230–31.  Without this bridge, Hatteras Island would have no road connection to the mainland.  AR 57230.  As a result, NCDOT has placed a high priority on maintaining this bridge.

In 1990, NCDOT began studying replacement alternatives for the Bonner Bridge, which had deteriorated significantly since its initial construction.  AR 83406.  After issuing several draft Environmental Impact Statements, Defendants in 2008 released a Final Environmental Impact Statement (the "2008 FEIS") for the Bonner Bridge Replacement Project.  AR 57225. This project's purported purpose was to provide a long-term replacement for the Bonner Bridge. AR 57230.  In order to ensure the sustainability of a replacement bridge, the 2008 FEIS also considered, at a high level, alternatives for maintaining the NC-12 corridor from Rodanthe to Oregon Inlet.  *See* AR 57250–397.

The 2008 FEIS included a Final Section 4(f) Evaluation, AR 57672, assessed several alternatives, AR 57250–392, and identified the Parallel Bridge Corridor with Phased Approach/Rodanthe Bridge as the preferred alternative, AR 57396–97.  A year later, in October 2009, a Revised Final Section 4(f) Evaluation was released, AR 75556, adding a new detailed study alternative—the Parallel Bridge Corridor with NC-12 Transportation Management Plan— and selecting it as the preferred alternative, AR 75560–61.  Under this plan, the Bonner Bridge over Oregon Inlet would be replaced ("Phase I") as soon as possible, with later phases to be

4

determined "based on actual conditions existing . . . at the point in time that additional action becomes necessary." AR 75561; RD 937. Defendants noted that "the current global sea level analytical models are not fully developed to predict local effects," which results in "uncertainty associated with estimating future sea levels and shoreline locations." AR 75561. Defendants cited this uncertainty as a reason for postponing decisions on future phases. AR 75561. At the time that the 2008 FEIS and the 2009 Revised Section 4(f) Evaluation were issued, the Rodanthe phase of the project ("Phase IIb") had not yet been devised and was little more than an ethereal "plan to make a plan." *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 398 (4th Cir. 2014).

In May 2010, Defendants released an Environmental Assessment for Phase I (the "2010 Phase I EA"), RD 906, and the Bonner Bridge replacement was officially approved in a Record of Decision issued in December 2010, AR 91519.

In July 2011, Defendant-Intervenors—represented by SELC—filed suit in this Court (the "Bonner Bridge Suit") seeking declaratory and injunctive relief for alleged violations of NEPA and Section 4(f) stemming from the Phase I approval process. *Defs. of Wildlife v. N.C. Dep't of Transp.*, No. 11-cv-00035 (E.D.N.C. filed July 1, 2011). In 2013, this Court ruled in favor of Defendants,[2] *Defs. of Wildlife v. N.C. Dep't of Transp.*, 971 F. Supp. 2d 510 (E.D.N.C. 2013), and Defendant-Intervenors appealed to the U.S. Court of Appeals for the Fourth Circuit. The Fourth Circuit affirmed in part, reversed in part, and remanded back to this Court. *Defs. of Wildlife*, 762 F.3d 374. Specifically, the Fourth Circuit affirmed this Court's holding that

_____

[2] The Defendants in both the Bonner Bridge Suit and the instant suit are the same: FHWA, the FHWA Division Administrator (John F. Sullivan, III), NCDOT, and the Secretary of NCDOT (Eugene Conti, Jr., in the first suit, and his successor, James H. Trogdon, III, in the present suit).

Defendants had not unlawfully segmented their analysis in violation of NEPA, *id.* at 398, while reversing this Court's holding that Defendants had established a joint planning exception that partially precluded the applicability of Section 4(f) to the portion of NC-12 in the Pea Island National Wildlife Refuge, *id.* at 402. By remanding fact-intensive issues back to this Court, the Fourth Circuit's decision increased the prospects of protracted litigation regarding Phase I, threatening to delay or halt Defendants' plans to replace the Bonner Bridge.

While the Bonner Bridge Suit was pending, there were several developments to aspects of the Bonner Bridge Replacement Project other than Phase I. In August 2011, Hurricane Irene struck the North Carolina coast and damaged NC-12 in two locations—in northern Rodanthe at the S Curves and within the Pea Island National Wildlife Refuge (the "Refuge") approximately six miles south of Oregon Inlet. RD 11560–61. In February 2013, Defendants issued an Environmental Assessment for Phase IIa, which was intended to provide long-term improvements to the damaged stretch of NC-12 within the Refuge six miles south of Oregon Inlet.[3] RD 29232. A Record of Decision for Phase IIa was issued in October 2013. RD 10739.

Defendants also sought to provide long-term improvements to NC-12 in the S Curves just north of Rodanthe. Among the alternatives initially considered were (i) Bridge on New Location (*i.e.*, the Jug-Handle Bridge);[4] (ii) a bridge within the existing NC-12 easement (the "Easement Bridge"); (iii) beach nourishment—an erosion-prevention strategy involving the replenishment

---

[3] The 2013 Phase IIa EA was unintentionally omitted from the Administrative Record. *See* D.E. 61-2. Defendant FHWA has provided Plaintiffs with a Bates-stamped copy of this document and has represented that it is also providing the Court with a copy and will supplement the Administrative Record accordingly.

[4] The selected Jug-Handle Bridge is even closer to the shoreline than the Jug-Handle Bridge alternative assessed in the 2013 Phase IIb EA. *Compare* RD 11572 (2013 version), *with* RD 28629 (selected version).

of sand and dunes; and (iv) beach nourishment combined with a bridge within the existing easement. RD 11568.

Throughout various phases of the Bonner Bridge Replacement Project, a Merger Team has made decisions regarding the next steps forward. This Merger Team consists of representatives from the federal and state environmental resource and regulatory agencies that have an interest in the Bonner Bridge Replacement Project: FHWA, NCDOT, the U.S. Fish and Wildlife Service, the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, the National Marine Fisheries Service, the National Park Service, the North Carolina Department of Cultural Resources, the North Carolina Department of Environment and Natural Resources ("NCDENR") – Wildlife Resources Commission, the NCDENR – Division of Water Quality, the NCDENR – Division of Coastal Management, and the NCDENR – Division of Marine Fisheries. AR 57711. Notably, the Merger Team is jointly led by FHWA, NCDOT, NCDENR (the three agencies that would eventually settle the Bonner Bridge Suit with SELC), and the Corps of Engineers, RD 18089, and "[t]hese agencies are the primary decision-making authority with regard to NEPA and Section 404 permitting," RD 18093. In the event that the Merger Team cannot reach a consensus on a particular decision point regarding the project, the issue is decided by the Dispute Resolution Board, which consists of representatives of the Merger Team's four lead agencies—FHWA, NCDOT, NCDENR, and the Corps of Engineers. RD 935–36; *see also* AR 63021–23.

At a meeting on December 15, 2011, the Merger Team agreed to eliminate from detailed study beach nourishment and beach nourishment combined with a bridge within the existing easement, thereby leaving the Jug-Handle Bridge and the Easement Bridge as the only remaining detailed study alternatives for Phase IIb (*i.e.*, the Rodanthe project). RD 2939 (press release);

*see also* RD 3015 (Dec. 19, 2011 email from NCDOT project manager stating that nourishment had been eliminated). Despite the fact that the Merger Team agreed not to perform detailed study on beach nourishment in December 2011, Defendants attempted to maintain a façade of public participation by soliciting public scoping comments regarding Phase IIb during December 2011 and January 2012. *See* RD 6337. Notably, the overwhelming majority of commenters supported beach nourishment as the long-term solution. RD 4899; RD 2888.

In December 2013, Defendants issued an Environmental Assessment for the improvements to NC-12 in the S Curves just north of Rodanthe (the "2013 Phase IIb EA"). RD 11542. Between the two Phase IIb detailed study alternatives—the Easement Bridge and the Jug-Handle Bridge—the 2013 Phase IIb EA identified the Easement Bridge as the preferred alternative for the Rodanthe project. RD 11586–87; *see also* RD 11572 (diagram showing Easement Bridge and Jug-Handle Bridge alternatives).

After identifying the Easement Bridge as the preferred alternative, NCDOT proceeded to try to obtain the Merger Team's concurrence that this alternative was **the least environmentally damaging practicable alternative**, or **LEDPA**. *See* RD 11758 (Dec. 19, 2013 NCDOT email tentatively reserving February 20, 2014, as a Merger Team meeting, the purpose of which is to "reach concurrence on CP 3 (LEDPA) and CP 4A (Avoidance and Minimization Measures)"); RD 11732 (Dec. 10, 2013 NCDOT email expressing a desire to "keep the project moving as quickly as possible, as the department's intent is to award a design-build contract for [Phase IIb] next spring").

However, before this concurrence was secured, Defendants made a 180-degree turn in which they abandoned the Easement Bridge (as well as the Phase IIa bridge that had already

been approved), and instead made binding commitments to take steps in furtherance of the Jug-Handle Bridge.

## II.    Bonner Bridge Suit Settlement Agreement

Defendants' abrupt reversal regarding Phase IIa and Phase IIb was not the result of objective analysis, but was instead the product of a *quid pro quo* agreement. Following "confidential negotiations" between Defendants and Defendant-Intervenors, during which time the decision-making process for the Rodanthe project was put "on hold pending the outcome of those discussions," RD 16238, Defendants entered into a settlement agreement (the "Settlement Agreement") pursuant to which they agreed to reverse course regarding their previously identified preferred alternative—the Easement Bridge—and instead take steps in furtherance of the Jug-Handle Bridge. RD 16622–53; *see also* RD 16576 (March 4, 2015 status report stating that "[o]ther work on Phase II on hold pending confidential settlement negotiations associated with the federal and state lawsuits on Phase I"); RD 17060 (HDR notes stating that "[t]he project was put on hold in 2013 pending resolution of the Southern Environmental Law Center (SELC) lawsuit against NCDOT").

Specifically, the Settlement Agreement, executed on April 30, 2015, RD 16638, required NCDOT to "identify Phase IIb Bridge on New Location [*i.e.*, the Jug-Handle Bridge] as its preferred alternative and seek Merger Team Concurrence Point 3," RD 16624 ¶ 1(c). As expressed in the Merger Team Memorandum of Understanding, RD 18088, Concurrence Point 3 is the identification of the LEDPA. RD 18091. Thus, the Settlement Agreement obligated NCDOT to seek the Merger Team's designation of the Jug-Handle Bridge as the least environmentally damaging of all practicable alternatives, regardless of what may be concluded pursuant to an objective analysis. This commitment is particularly noteworthy in light of the fact that Defendants had previously identified the Easement Bridge as the preferred alternative and

NCDOT had taken steps to obtain the Merger Team's concurrence that the Easement Bridge, not

the Jug-Handle Bridge, was the LEDPA.  *See* RD 11586–87; RD 11758; RD 11732.  The

Settlement Agreement also required the NCDENR – Division of Coastal Management, to

"provide a written statement of [its] support and preference for [the Jug-Handle Bridge]" and to

"otherwise . . . use best efforts to help NCDOT attempt to secure Merger Team concurrence."

RD 16624–25 ¶ 1(e).

Furthermore, the Settlement Agreement provided that, in the event that the Merger Team

concurred that the Jug-Handle Bridge was the Phase IIb LEDPA, NCDOT and FHWA must

"promptly revise" the Section 4(f) Evaluation and "associated environmental document prepared

pursuant to NEPA" (*i.e.*, a revised EIS or EA) by identifying the Jug-Handle Bridge as the

preferred alternative, in addition to "[p]ropos[ing] to identify the Phase IIb [Jug-Handle Bridge]

Alternative as the 'least overall harm' alternative."  RD 16626–27 ¶¶ 3(c)(i)(1), (3).

*Only* if the Jug-Handle Bridge was identified as the LEDPA, among other commitments

required of Defendants, were the Defendant-Intervenors obligated to dismiss the Bonner Bridge

Suit, thereby allowing the Bonner Bridge replacement to proceed unchallenged.  RD 16625 ¶

1(h).  And *only* if Defendants selected the Jug-Handle Bridge as the final Phase IIb alternative

did Defendant-Intervenors agree not to file a new suit challenging the Phase IIb decision.  RD

16625 ¶ 2(b).  The Settlement Agreement also required Defendants to rescind their contract for

construction of the separate Phase IIa project, for which a Record of Decision had already been

issued in October 2013.  RD 16623 ¶ 1(a).

Taken together, the Settlement Agreement bound three of the Merger Team's four

leading agencies—NCDOT, FHWA, and NCDENR—to take steps in furtherance of the Jug-

Handle Bridge.  This *quid pro quo*, bridge-for-a-bridge bargain appeased Defendant-Intervenors

by furthering their agenda of eliminating sections of highway from the Refuge.  *See* RD 23872

(SELC comments stating that it has "long supported" "a single Pamlico Sound bridge to bypass

the entire Pea Island National Wildlife Refuge").  Specifically, the Jug-Handle Bridge alternative

would entail moving a short stretch of NC-12 from the current easement to a bridge over Pamlico

Sound, thereby eliminating part of NC-12 from the Refuge and opening the possibility of a future

extension to the Jug-Handle Bridge that would remove further stretches of highway from the

Refuge.  *See* RD 16627 ¶ 3(c)(iii) (requiring NCDOT, in the event the Jug-Handle Bridge is

identified as the LEDPA, to plan, design, and construct the Jug-Handle Bridge "so as not to

preclude the addition of a later extension into the Pamlico Sound to the north").  The rescission

of the Phase IIa contract also forestalled plans to construct a new permanent bridge in the Refuge

six miles south of Oregon Inlet, thereby keeping the door open to removing this separate section

of NC-12 from the Refuge as part of a future extension of the Jug-Handle Bridge.  *See* RD

23462.  Through the Settlement Agreement, SELC and its clients were able to promote their own

discrete agendas at the expense of public participation and objective decision-making.

## III.     Phase IIb – The Rodanthe Project

With the Settlement Agreement came the lifting of the multi-year "hold" that had been

placed on the Phase IIb decision-making process addressing the "S" Curves just north of

Rodanthe.  RD 16238.  Indeed, before the ink of the Settlement Agreement had dried, NCDOT

began to seek concurrence from the various Merger Team members that the Jug-Handle Bridge

was the LEDPA.  *See* RD 16654 (May 5, 2015 NCDOT email to NOAA officials stating that

"[i]t looks like we are, at long last, ready to assemble the merger team to reach a decision about

which option to pursue as our Preferred Alternative/LEDPA").  This sudden change in the pace

of Phase IIb development is consistent with NCDOT emails showing that the project was

contingent on negotiations with Defendant-Intervenors.  RD 16383 (Feb. 16, 2015 email

expressing the possibility of "revising our preferred [alternative] to the Bridge on New Location" based on litigation over the Bonner Bridge and stating that "[a]s settlement discussions continue, I think we need to prepare ourselves to quickly get in front of the merger team to make a decision on either of the alternatives."); RD 16986 (June 18, 2015 NCDOT email soliciting concurrence from Albemarle Commission and explaining that "SELC's clients have agreed to drop the federal and state lawsuits under certain conditions," including "that we reach concurrence on the 'Bridge in the Sound' [*i.e.*, Jug-Handle Bridge] alternative as the Least Environmentally Damaging Practicable alternative").

Unsurprisingly, in June 2015, less than two months after the Settlement Agreement was executed and before any additional studies were performed, the Merger Team identified the Jug-Handle Bridge as the LEDPA. RD 16912; RD 23565. To comply with their part of the *quid pro quo*, Defendant-Intervenors shortly thereafter dismissed their suit challenging the Bonner Bridge replacement. *See* Ex. A (joint stipulation of dismissal).

Construction of the Bonner Bridge replacement commenced in March 2016, RD 23438, and Defendants identified the Jug-Handle Bridge as the Rodanthe project preferred alternative in a Revised Phase IIb EA issued on May 24, 2016, RD 23418. The 2016 Revised Phase IIb EA states that it "takes into account" the terms of the Settlement Agreement but that "[t]he stipulations did not predetermine the choice of the [Jug-Handle Bridge] Alternative as the Preferred Alternative." RD 23443. This conclusory statement is belied by the fact that the Settlement Agreement explicitly required NCDOT to identify the Jug-Handle Bridge as the preferred alternative for Phase IIb, and required both NCDOT and FHWA to revise the EA to reflect this reversal from the 2013 Phase IIb EA, which had identified the Easement Bridge as the preferred alternative. Moreover, the 2016 Revised Phase IIb EA that identified the Jug-

Handle Bridge as the preferred alternative did not differ in any material way from the 2013 Phase IIb EA, which had identified the Easement Bridge as the preferred alternative. No additional studies were performed and no other alternatives were considered. The Settlement Agreement thus constituted the only material new circumstance reflected in the 2016 Revised Phase IIb EA.

Furthermore, the Settlement Agreement provided that Defendant-Intervenors would not challenge Defendants' Phase IIb decision only if Defendants followed through with their new preferred alternative and formally approved the Jug-Handle Bridge as the selected alternative. RD 16625 ¶ 2(b); *see also* RD 25193 (SELC comments on the Revised EA stating that "SELC will not challenge the validity of the Environmental Assessment if the agencies move ahead with the Bridge on New Location Alternative as the Selected Alternative for Phase IIb"). And the desire to avoid further litigation with Defendant-Intervenors was at the forefront of Defendants' attention during the remainder of the Phase IIb decision-making process. *See* RD 25194 (internal NCDOT email reporting the "[g]ood news" that "SELC is happy with the Revised EA" and would not sue as long as the Jug-Handle Bridge was chosen as the selected alternative). Thus, Defendants followed through with their efforts to appease Defendant-Intervenors, confirming the Jug-Handle Bridge as the Selected Alternative in the Phase IIb Record of Decision signed on December 15, 2016. RD 28613. In their desire to promptly clear the path for the Bonner Bridge replacement, Defendants failed to adequately analyze a wide range of alternatives and impacts associated with the Rodanthe project, as explained further in Sections II–III below.

On February 2, 2017, Plaintiffs filed the instant suit, seeking injunctive and declaratory relief against Defendants' unlawful approval of the Jug-Handle Bridge.

## STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Plaintiffs' claims are subject to judicial review under the Administrative Procedure Act, which provides that a court may set aside agency action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if it was taken "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). The Fourth Circuit has explained that an agency decision is arbitrary and capricious if the agency has

> relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287–88 (4th Cir. 1999).

Regarding claims brought pursuant to NEPA, courts must examine whether the agencies have taken a "hard look" at the environmental impacts of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). A reviewing court must also ensure that the agencies have "[r]igorously explore[d] and objectively evaluate[d] all reasonable alternatives." *S.C. Wildlife Fed'n v. S.C. Dep't of Transp.*, 485 F. Supp. 2d 661, 667 (D.S.C. 2007) (quoting 40 C.F.R. § 1502.14(a)) (first alteration in original). The court's "inquiry must 'be searching and careful,'" and it "must not reduce itself to a 'rubber-stamp' of agency action." *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 601 (4th Cir. 2012) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) and *Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 746 (1973)).

An agency's decision can be upheld only where the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). Likewise, "[i]n reviewing an agency's Section 4(f) determination, [courts] must conduct a 'thorough, probing, indepth review' to ensure that the Secretary's determination complies with Section 4(f)'s requirements." *Defs. of Wildlife,* 762 F.3d at 401 (quoting *Monroe Cty. Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 700 (2d Cir. 1972)).

## STANDING

Each of the individual plaintiffs in this suit has standing, as the interests of each plaintiff "fall within the zone of interests protected by the law[s] invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014). Plaintiffs regularly use and enjoy Pamlico Sound and the Refuge, including by participating in a number of recreational activities within both the Sound and the Refuge. Ex. B ¶¶ 7–12 (Decl. of Mark Haines); Ex. C ¶¶ 3–11 (Decl. of Thomas Aschmoneit); Ex. D ¶¶ 4 (Decl. of David Hadley); Ex. E ¶¶ 5–8 (Decl. of Jer Mehta); Ex. F ¶ 5 (Decl. of Glenn Stevens). Each of the individual plaintiffs owns and/or regularly visits properties in close proximity to the site of the proposed Jug-Handle Bridge, and their use and enjoyment of these properties will be adversely impacted if the unlawful Jug-Handle Bridge is constructed. Ex. B ¶¶ 2, 16 (Decl. of Mark Haines); Ex. C ¶¶ 2, 14 (Decl. of Thomas Aschmoneit); Ex. D ¶¶ 2, 5 (Decl. of David Hadley); Ex. E ¶¶ 2–3, 12 (Decl. of Jer Mehta); Ex. F ¶¶ 2, 5, 9 (Decl. of Glenn Stevens); Ex. G (Decl. of Richard Ayella). Plaintiffs also regularly visit sites located within, and appreciate the historic attributes of, the Rodanthe Historic District. Ex. B ¶¶ 13–14 (Decl. of Mark Haines); Ex. C ¶¶ 3–11 (Decl. of Thomas Aschmoneit; Ex. E ¶¶ 9–10 (Decl. of Jer Mehta); Ex. G ¶ 7 (Decl. of Richard Ayella). Thus, the

individual plaintiffs have economic, "aesthetic, conservational, and recreational" interests at stake. *Sierra Club v. Morton*, 405 U.S. 727, 738 (1972).

Additionally, Plaintiff Save Our Sound OBX, Inc. ("SOS OBX") has standing to bring suit on behalf of its members, because SOS OBX (i) includes at least one member with individual standing, (ii) is organized for a purpose germane to the claim, and (iii) the instant claims do not require the participation of individual members in the lawsuit. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996); *see also* Ex. B ¶¶ 3–5 (Decl. of Mark Haines).

<u>**ARGUMENT**</u>

**I.     Defendants Violated NEPA by Biasing Their Analysis in Favor of the Jug-Handle Bridge.**

The selection of the Jug-Handle Bridge was not the product of an objective alternatives analysis conducted in compliance with NEPA, but rather was controlled by the Settlement Agreement, which impermissibly tainted Defendants' analysis.  The alternatives analysis is the "heart" of the NEPA process and is intended to "provid[e] a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.[5]  Federal law requires that "[a]gencies shall not commit resources prejudicing selection of alternatives before making a final decision."  *Id.* § 1502.2(f).  "NEPA procedures must insure that environmental information is available to public officials and citizens *before* decisions are made . . . ."  *Id.* § 1500.1(b) (emphasis added), and the alternatives analysis must "serve as the means of assessing the environmental impact of proposed agency actions," rather than serving as a mere "disclosure document" "justifying decisions already made."  *Id.* §§ 1502.1, 1502.2(g).

Case law confirms that NEPA requires agencies to take a "hard look" at the environmental consequences of their actions.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  This hard look must be based on "good faith objectivity rather than subjective impartiality," *Fayetteville Area Chamber of Commerce v. Volpe*, 515 F.2d 1021, 1026 (4th Cir. 1975) (internal quotations omitted), and agencies must act as "***unbiased and conflict free decision maker[s]***," *Wash. Cty. v. U.S. Dep't of Navy*, 317 F. Supp. 2d 626, 631 (E.D.N.C. 2004) (emphasis added).

---

[5] "CEQ regulations are binding on federal agencies."  *Piedmont Envtl. Council v. F.E.R.C.*, 558 F.3d 304, 318 (4th Cir. 2009).

In *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000), plaintiffs challenged a decision by the National Oceanic and Atmospheric Administration ("NOAA") to support the Makah Indian Tribe's petition to the International Whaling Commission ("IWC") for a license to hunt gray whales. The Ninth Circuit found that NOAA illegally predetermined the Environmental Assessment because it prepared the analysis *after* NOAA had already entered into a contract with the Makah, pursuant to which NOAA had committed to support the Makah's license. 214 F.3d at 1145 (finding that it was "highly likely that because of the Federal Defendants' prior written commitment to the Makah and concrete efforts on their behalf, the EA was slanted in favor of finding that the Makah whaling proposal would not significantly affect the environment").

The facts here are even more damning. The Settlement Agreement obligated Defendants to pursue a discrete course of action—the Jug-Handle Bridge—under threat of additional litigation from SELC. Moreover, the Jug-Handle Bridge alternative differed entirely from the Easement Bridge—the alternative Defendants had previously identified as the preferred alternative. Due to the Settlement Agreement, the agencies were not free to act as "unbiased and conflict free decision maker[s]." *Wash. Cty.*, 317 F. Supp. 2d at 631.

Read together with the Merger Team's procedures, the Settlement Agreement's terms foreclosed any chance that another alternative would be selected for the Rodanthe project. To be sure, the Agreement says that "[n]othing in this Agreement requires or should be interpreted to predetermine the choice of the [Jug-Handle Bridge] as the Selected Alternative." RD 16624 ¶ 1(c). But simply saying that it does not constitute predetermination does not make it so.

The Settlement Agreement dictated the selection of the Jug-Handle Bridge. NCDOT was required to "identify" the Jug-Handle Bridge as the preferred alternative, and "seek … concurrence" from the rest of the Merger Team that the Jug-Handle Bridge is the LEDPA. RD

16624–25 ¶ 1(c).  NCDENR-DCM, another lead Merger Team member, was similarly required to provide a written statement that it supported and preferred the Jug-Handle Bridge, and to "use its best efforts to help NCDOT attempt to secure Merger Team concurrence" to designate the Jug-Handle Bridge as the LEDPA.  RD 16624–25 ¶ 1(e).  Because the Merger Team could only act by consensus, *see* RD 18089, it could not select a different LEDPA with these agencies so committed to the Jug-Handle Bridge.  And absent consensus, the final decision goes to the Dispute Resolution Board, where the conflict of interest is even more pronounced than with the Merger Team as a whole.  NCDOT and NCDENR have two of the four votes on the Dispute Resolution Board, giving them an effective veto over any other proposal.  RD 18093 (identifying NCDOT, NCDENR, FHWA, and the Corps of Engineers as the primary decision makers and responsible for dispute resolution).

Moreover, the third seat on the four-member Dispute Resolution Board is held by FHWA, which also signed the Settlement Agreement.  FHWA could only obtain dismissal of the SELC lawsuit after "securing the Concurrence Point 3," which was selection of the Jug-Handle Bridge as the LEDPA.  RD 16625 ¶ 1(h).  In other words, the Settlement Agreement was worthless to FHWA and the other settling agencies unless the Merger Team proceeded to designate the Jug-Handle Bridge as the LEDPA.[6]

---

[6] Defendants were very much aware of the ever-looming threat of renewed litigation from SELC in the event that a different alternative was ultimately chosen as the selected alternative.  *See* RD 25194 (internal NCDOT email reporting the "[g]ood news" that "SELC is happy with the Revised EA" and would not sue as long as the Jug-Handle Bridge was chosen as the selected alternative).  The record is clear that SELC would sue unless Defendants made the Jug-Handle Bridge the selected alternative.  RD 16625 ¶ 2(b).  And it should come as no surprise that Defendants would want to avoid settling the Bonner Bridge Suit with Defendant-Intervenors only to wade into another suit regarding Phase IIb.

With half of the Dispute Resolution Board contractually prohibited from agreeing to designate as the LEDPA any alternative but the Jug-Handle Bridge, and a third member who agreed to these conflict-inducing terms and stood to benefit only if the Jug-Handle Bridge was designated as the LEDPA, the Settlement Agreement eliminated the possibility of any alternative other than the Jug-Handle Bridge being selected as the LEDPA.

And predetermining the Jug-Handle Bridge as the LEDPA was the same thing as predetermining the final selected alternative for the project. Because the agency action involves the use of property protected by Section 4(f), *see* RD 28648–51, the selected alternative *must* be the one that causes the "least overall harm" to the protected properties—*i.e.*, the LEDPA. 23 C.F.R. § 774.3(c)(1). Indeed, NCDOT has gone so far as to publicly describe the LEDPA designation as being equivalent to an "agreement on which alternative will be built." RD 11765. Thus, Defendants could not have lawfully selected a final alternative other than the alternative that was identified as the LEDPA. And because the Settlement Agreement allowed only the Jug-Handle Bridge to be designated as the LEDPA, the Settlement Agreement allowed only the Jug-Handle Bridge to be selected as the final alternative.

As a result, Defendants did not act as "unbiased and conflict free decision maker[s]," as required by NEPA. *Wash. Cty.*, 317 F. Supp. 2d at 631. Rather, the Settlement Agreement determined that the Jug-Handle Bridge would be the choice of three of the four lead agencies, rendering subsequent "consideration of the environmental impact . . . less objective given the commitments made on the project." *Wash. Cty.*, 317 F. Supp. 2d at 634. Indeed, the subsequent analysis became little more than "a mere formality." *Id.*

It is of no moment that, after the fact, Defendants declared in the 2016 Revised Phase IIb EA that the Settlement Agreement "did not predetermine the choice of the [Jug-Handle Bridge]

Alternative as the Preferred Alternative." RD 23443. This conclusory assertion is belied by the explicit terms of the Settlement Agreement, *see supra*, and does not retroactively infuse objectivity into Defendants' flawed alternatives analysis.

As a threshold matter, an argument that Defendants would have approved the Jug-Handle Bridge even in the absence of the Settlement Agreement is suspect, given that the initial 2013 Phase IIb EA identified the Easement Bridge as the preferred alternative, and NCDOT had already taken steps toward identifying this alternative as the LEDPA when Phase IIb was put on "hold" pending the "confidential negotiations" with Defendant-Intervenors. RD 16238; *see also* RD 11732.

But more fundamentally, NEPA's requirements are procedural rather than substantive. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). Thus, the legality of the Jug-Handle Bridge decision depends on the legality of the process by which it was approved, not on whether the Jug-Handle Bridge would have been approved pursuant to a hypothetical process that did not occur. Instead of making guesses as to what Defendants would have done under an untainted NEPA process, the Court should vacate the 2016 Phase IIb Record of Decision and require Defendants to "begin the NEPA process afresh"—this time pursuant to a process that complies with federal law. *Metcalf*, 214 F.3d at 1146.

## II. Defendants Acted Arbitrarily and Capriciously by Failing to Disclose and Analyze the Effects of the Jug-Handle Bridge.

Defendants' biased alternatives analysis manifested itself in, and is evidenced by, Defendants' failure to analyze the impacts of the Rodanthe project on important environmental, cultural, and historic resources. Whether or not the decision was illegally predetermined, the agencies' rush to approve the Jug-Handle Bridge led them to cut corners and violate federal laws

requiring a full assessment of environmental impacts. Specifically, Defendants violated NEPA, Section 4(f), and Section 106 by failing to disclose and analyze the impacts of the Phase IIb project on the Rodanthe Historic District, a wetlands area in Rodanthe, the Refuge, Pamlico Sound, and the socioeconomic characteristics of the community of Rodanthe.

### A. Defendants Must Analyze Environmental Impacts and Provide Protection for Protected Land and Historic Property.

NEPA. If an agency's action has adverse effects that are "significant," they must be analyzed in an Environmental Impact Statement. 40 C.F.R. § 1501.4(e); *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002) ("If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* agency action is taken") (quotation marks omitted). Here, Defendants do not claim that the Phase IIb Rodanthe project has no significant impacts. Rather, Defendants incorrectly assert that "the modifications and changes assessed in the Revised Phase IIb EA do not result in any new, significant impacts not previously identified" in the eight-year-old 2008 FEIS. RD 28666. Because Defendants failed to consider certain impacts at all, in either the 2008 FEIS or the Revised Phase IIb EA, the conclusion that there are no *new* significant impacts was arbitrary and capricious.

Section 4(f). Section 4(f) effectuates "the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a). Unlike NEPA, which imposes strictly procedural requirements on agency decision-making, Section 4(f) "imposes substantive restraints on an agency's action," in addition to "procedural requirements." *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 398, 401 (4th Cir. 2014). Specifically, under Section 4(f), FHWA is permitted to approve a transportation project requiring the use of a significant "wildlife and waterfowl refuge" or "historic site" only if "there

is no prudent and feasible alternative to using that land" and "the program or project includes all possible planning to minimize harm to the . . . wildlife and waterfowl refuge, or historic site resulting from the use."  49 U.S.C. § 303(c).  If there is no "feasible and prudent avoidance alternative," FWHA "may approve . . . only the alternative that . . . [c]auses the least overall harm" to the Section 4(f) property.  23 C.F.R. § 774.3(c)(1).  "Use," for purposes of Section 4(f), includes both actual uses that physically incorporate land into a transportation facility, and constructive uses that entail proximity impacts that substantially impair the protected activities, features, or attributes that qualify the property for protection under Section 4(f).  23 C.F.R. § 774.17.  "In reviewing an agency's Section 4(f) determination, [courts] must conduct a 'thorough, probing, indepth review' to ensure that the Secretary's determination complies with Section 4(f)'s requirements."  *Defs. of Wildlife,* 762 F.3d at 401 (quoting *Monroe Cty. Conservation Council v. Volpe*, 472 F.2d 693, 700 (2d Cir. 1972)).

Section 106.  Congress enacted the National Historic Preservation Act in 1966 to "foster conditions under which our modern society and our historic property can exist in productive harmony."  54 U.S.C. § 300101(1).  Section 106 requires federal agencies to "take into account the effect of the undertaking on any historic property" "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license."  54 U.S.C. § 306108.  This provision likewise provides that "[t]he head of the Federal agency shall afford the [Advisory Council on Historic Preservation] a reasonable opportunity to comment with regard to the undertaking."  *Id.*  An "historic property" is defined as "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object."  54 U.S.C. § 300308.  And "undertaking" means "a project, activity, or program

funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval." 36 C.F.R. § 800.16(y). Like NEPA, Section 106 is often described as a "stop, look, and listen" requirement. *Narragansett Indian Tribe v. Warwick Sewer Auth.*, 334 F.3d 161, 166 (1st Cir. 2003).

### B.    Defendants Violated NEPA, Section 4(f), and Section 106 by Failing to Adequately Evaluate the Impacts of the Construction Process.

By failing to disclose—let alone analyze—the impacts of construction traffic, the Phase IIb evaluation was fatally flawed. Specifically, Defendants' cursory Phase IIb analysis fails to disclose—much less analyze the impacts of—how haul roads would be used during construction of the Jug-Handle Bridge. This is a straightforward violation of NEPA's "hard look" requirement, and also violates Sections 4(f) and 106. *Robertson*, 490 U.S. at 350.

Despite the planned installation and use of new haul roads to transport construction materials over the course of three-plus years, none of the official documents regarding Phase IIb—including the 2013 Phase IIb EA, the 2016 Revised Phase IIb EA, and the Phase IIb ROD—disclosed the use of haul roads, let alone analyzed the associated impacts. For example, the 2016 Revised Phase IIb EA incorrectly states that "[t]here are no temporary impacts to wetlands . . . currently proposed," RD 23509, and that "the Phase IIb detailed study alternatives avoid the Rodanthe Historic District," RD 23542; *see also* AR 57369 ("The right-of-way would not be widened and no construction easement purchased within the National Register-eligible Rodanthe Historic District.")

But that simply is not accurate. The Administrative Record includes two construction diagrams, RD 26–27, one of which depicts a "ferry terminal modified to accept barge deliveries" just to the west of the Rodanthe Historic District, RD 26. This diagram also shows two parallel

24

"haul roads" that are plotted to run from the ferry terminal to the southern terminus of the Jug-Handle Bridge, cutting directly through the Rodanthe Historic District and an adjacent wetlands area. RD 26; *see also* AR 57402 (map delineating boundaries of Rodanthe Historic District). The diagram further indicates that a crane will be required to unload construction equipment from the barges, which, combined with the nature of bridge construction, suggests that very large items will be transported along the haul roads. And as Defendants have indicated, construction is not of *de minimis* duration, but rather is planned to last between three and three-and-a-half years. RD 28663.

The lack of disclosure and analysis of construction impacts during the Rodanthe project is highlighted by a comparison to the 2008 FEIS, which contained extensive analysis of the construction-period impacts of the Bonner Bridge replacement under Phase I. AR 57349–62, 57662–68. That analysis carefully evaluated the use of haul roads, indicated their precise dimensions, and provided for how they were would be filled in and revegetated after construction was completed. AR 57268, 57276, 57360–61, 57379, 57667–68.

   1.  <u>The failure to disclose and evaluate the effects of the haul roads constitutes a violation of NEPA.</u>

CEQ's binding regulations set forth a number of requirements regarding an agency's determination of whether impacts are significant enough to require an EIS. 40 C.F.R. § 1508.27. Several of those triggers are implicated here: agencies must evaluate the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources . . . wetlands . . . or ecologically critical areas"; and "[t]he degree to which the action may adversely affect [sites] listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources." *Id*. §§ 1508.27(b)(3), (b)(8).

The contractor's diagrams, RD 26–27, show that construction of the Jug-Handle Bridge entails the installation and use of haul roads through Rodanthe, including through the Rodanthe Historic District and an adjacent wetlands area. Among the impacts that Defendants have failed to analyze include the destruction of habitat and the noise, vibrations, and sights associated with transporting construction materials through these areas during the course of the multi-year project.

By failing to evaluate the effects of hauling construction materials through a wetlands area, Defendants violated the mandate to evaluate the "[u]nique characteristics of the geographic area such as . . . wetlands." 40 C.F.R. § 1508.27(b)(3). Additionally, the Rodanthe Historic District is eligible for listing in the National Register. RD 28652. Thus, Defendants violated the mandate to evaluate effects on sites "listed in or eligible for listing in the National Register of Historic Places," and "significant . . . cultural[] or historical resources." 40 C.F.R. § 1508.27(b)(8). Defendants not only failed to take the requisite "hard look" at the impacts of the construction process; they also deprived the public of the knowledge necessary to meaningfully participate in the decision-making process, as required by NEPA. *See Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1177-78 (10th Cir. 2008) (explaining that NEPA is intended to ensure "that an agency will inform the public that it has considered environmental concerns in its decision-making process") (internal quotation marks omitted).

2.  The failure to evaluate the effects of the haul roads constitutes a violation of Section 4(f).

Defendants have acknowledged that the Rodanthe Historic District is a Section 4(f) property, but wrongly concluded that the Jug-Handle Bridge would have "No Adverse Effect" on it. RD 23498; RD 28640. They based this erroneous conclusion solely on the fact that the Jug-Handle Bridge will be located outside of the Rodanthe Historic District and the assertion that the

26

views of the bridge will not adversely impact the Rodanthe Historic District because views of modern commercial and residential sites are already visible from this area. RD 23498; RD 28640.

Because the haul roads would physically travel through the Rodanthe Historic District, the development of the Jug-Handle Bridge constitutes an actual use of Section 4(f) property. *See* 23 C.F.R. § 774.17. The record is devoid of any analysis of the impacts of this use. No evaluation was ever completed to consider whether other alternatives would constitute a "feasible and prudent avoidance alternative" by avoiding the use of haul roads through the Rodanthe Historic District. 23 C.F.R. § 774.3(c). Likewise, Defendants failed to evaluate whether the "project includes all possible planning to minimize harm" to the Rodanthe Historic District by, for example, routing the haul roads around the Rodanthe Historic District, routing the haul roads through the narrowest portion of the Rodanthe Historic District, or otherwise constructing or using the haul roads in such a manner to minimize the impacts on the historic and cultural qualities of the Rodanthe Historic District. 49 U.S.C. § 303(c)(2).

 3. The failure to evaluate the effects of the haul roads constitutes a violation of Section 106.

The Rodanthe Historic District is also a "historic property" for purposes of Section 106 because it is "eligible for inclusion on[] the National Register." 54 U.S.C. § 300308; *see also* RD 28652. And the instant project is an "undertaking" because it is carried out "with Federal financial assistance" and requires "Federal . . . approval." 36 C.F.R. § 800.16(y); RD 28637 ("Phase IIb would primarily be funded through existing *federal* and state funding sources.") (emphasis added); RD 28666 (federal approval of Jug-Handle Bridge). Thus, Section 106 requires FHWA to "take into account the effect of the [Jug-Handle Bridge project] on [the Rodanthe Historic District]" prior to the issuance of the Phase IIb Record of Decision. 54 U.S.C.

§ 306108. The failure to disclose and evaluate the impact of haul roads through the District violates these requirements as well.

Moreover, there is nothing in the record suggesting that Defendants disclosed to the Advisory Council on Historic Preservation ("ACHP") the plans to transport construction materials through the Rodanthe Historic District. As a result, ACHP was not afforded "a reasonable opportunity to comment" on the effects of such hauling on the Rodanthe Historic District. 54 U.S.C. § 306108. This too constitutes a violation of Section 106.

Finally, Defendants have violated the terms of the Section 106 Programmatic Agreement for the Bonner Bridge Replacement Project, which provides that "[t]he Undertaking will be designed in a manner that keeps subsequent phases of the project out of the limits of the Rodanthe Historic District." RD 5364.

    4.    <u>Defendants' failure to consider the impacts of the construction process are not cured by FHWA's claims that the construction diagrams were created after the Phase IIb ROD was issued.</u>

In response to Plaintiffs' motion to amend their complaint, D.E. 78, FHWA stated that the construction diagrams, RD 26–27, were accidentally included in the Administrative Record and that they were actually created after the Phase IIb ROD was issued. D.E. 88. This misses the point, because FHWA still has not pointed to any consideration of the placement and impact of haul routes, which have always been a necessary part of the project. In fact, the record includes other documents, beyond the contested diagrams, showing plans for haul roads through protected areas.

First, as a starting point, Defendants have not yet provided any evidence that these diagrams were in fact created after December 15, 2016, the date of the Phase IIb ROD. *See* RD 28666. Moreover, the record indicates that the contractor for the Jug-Handle Bridge did, in fact, alert Defendants to its plans to construct haul roads through historically sensitive areas prior to

Defendants' issuance of the Phase IIb ROD. In a set of questions during the bidding process, the selected contractor asked Defendants the following question: "If the contractor proposes access through historic areas, would SHPO [State Historic Preservation Office] consider that an impact?" RD 19699. Plaintiffs are not aware of any response to this question in the record. Thus, Defendants not only failed to analyze and mitigate potential impacts of the construction process on historic and ecological areas; they failed to do so even after being put on notice that the contractor was considering using haul roads in a manner that would exacerbate such impacts. Similarly, the Final Request for Proposals ("RFP") for Phase IIb indicates that Defendants were well aware of the likely use of haul roads. *See* RD 24840, 24851–52. Nonetheless, Defendants did not include any language in the RFP about requirements to avoid, or else minimize, the impact of haul routes on the Rodanthe Historic District.

*     *     *

NEPA, Section 4(f), and Section 106 required Defendants to consider the obvious need for haul routes, and to minimize the impact on the Rodanthe Historic District and the adjacent wetlands area. Certainly, the Jug-Handle Bridge will not suddenly appear in its finalized form. Rather, the bridge must be constructed, and that construction process is part of the action requiring Defendants' approval. Defendants fulfilled their obligations to analyze the impacts of haul roads around the site of the Bonner Bridge during Phase I, *see* AR 57268, 57276, 57360–61, 57379, 57667–68, but they ignored them entirely when failing to consider the impact of the construction process for the Rodanthe project. Because Defendants had an obligation to take a hard look at the impacts of construction regardless of the precise haul routes that were ultimately selected for hauling construction materials, it is immaterial when the contractor's diagrams were created, or whether they even represent the actual hauling plans that will be followed in this

project. The fact remains that the record is impermissibly devoid of any analysis of the impacts

of hauling, which will inevitably take place.

      **C.**    **Defendants Violated Section 4(f) by Failing to Properly Analyze the Effects of Phase IIb on the Pea Island National Wildlife Refuge.**

             1.    <u>Defendants failed to properly evaluate the effects of Phase IIb on the Refuge in light of the Fourth Circuit's decision in the Bonner Bridge Suit.</u>

Defendants' Section 4(f) analysis is also fatally flawed in that it fails to adequately

analyze the impacts of the Phase IIb alternatives on the Refuge "as a refuge." This issue was

central to the Bonner Bridge Suit, where Defendants claimed that NC-12 was concurrently and

jointly planned with the Refuge such that the Section 4(f) Evaluation need not consider the

impacts of the Bonner Bridge Replacement Project on the Refuge as a refuge, but rather only on

the Refuge's attributes as an historic resource.[7] *See Defs. of Wildlife v. N.C. Dep't of Transp.*,

762 F.3d 374, 401–02 (4th Cir. 2014); *see also* AR 75567–70.

In the Bonner Bridge Suit, the Fourth Circuit held that the record did not support a

conclusion that the joint planning exception applied and remanded for further analysis. *Defs. of*

*Wildlife*, 762 F.3d at 402. The record in the instant suit contains no new information pertinent to

the issue of whether the joint planning exception applies. Thus, as in the Bonner Bridge Suit, the

record for the instant suit does not support a finding of a joint planning exception. And without

the joint planning exception, Defendants are required to analyze the project's impacts on the

Refuge's attributes as a wildlife refuge, in addition to its attributes as an historic resource. *Id.*

---

    [7] Under the joint planning exception, Section 4(f) does not apply to an otherwise protected property "[w]hen a property is formally reserved for a future transportation facility before or at the same time a park, recreation area, or wildlife and waterfowl refuge is established and concurrent or joint planning or development of the transportation facility and the Section 4(f) resource occurs." 23 C.F.R. § 774.11(i).

Notably, the Fourth Circuit's decision in the Bonner Bridge Suit was issued after the 2013 Phase IIb EA but before the 2016 Revised Phase IIb EA. In response to the Fourth Circuit's decision, Defendants provided only superficial supplemental analysis regarding the impacts on the Refuge's refuge-related attributes. Indeed, in updating the Section 4(f) Evaluation for the 2016 Revised Phase IIb EA, Defendants did little more than remove the 2013 Phase IIb EA's statements that the joint planning exception precludes any Section 4(f) use of the Refuge as a refuge. *See* RD 17327–28. But Defendants cannot meet the requirements of Section 4(f) simply by removing statements that a Section 4(f) evaluation is not needed for the refuge-related impacts on the Refuge. Rather, they are required to affirmatively conduct a Section 4(f) evaluation of refuge-related impacts on the Refuge.

Regarding the minimal refuge-related analysis in the 2013 Phase IIb EA and 2016 Revised Phase IIb EA, Defendants note that "[p]ermanent loss of wildlife habitat in the Refuge would be 0.01 acre of pile impact (0.30 acre if assuming the larger pile cap area)." RD 11639; RD 23537. However, there is no analysis of whether, and to what extent, this loss of habitat would impact the wildlife that the Refuge is intended to protect. In addition, the permanent destruction of habitat is not the only source of potential impacts on the Refuge's attributes as a wildlife refuge. For example, proximity impacts such as noise, vibrations, and light impacts from the Jug-Handle Bridge may impact wildlife patterns within the Refuge. *See* RD 23743. But the Section 4(f) Evaluation does not address such impacts at all.

Notably, Defendants' bare-bones analysis of the Refuge as a wildlife refuge stands in stark contrast to Defendants' analysis of the Refuge as an historic resource, for which Defendants did consider proximity impacts such as visual obstructions. RD 23540. Perhaps this disparate treatment is attributable to Defendants' haste to finalize the Jug-Handle Bridge decision

31

in the wake of the Fourth Circuit's decision and the ensuing Settlement Agreement. But this is not a legally sufficient justification. Although the Settlement Agreement may have rid Defendants of SELC's challenge, it certainly did not relieve Defendants of their obligations to comply with Section 4(f).

> **D.      Defendants Violated NEPA by Failing to Adequately Consider the Socioeconomic Impacts of the Project.**

NEPA requires that agencies consider the reasonably foreseeable social and economic impacts of a proposed action when "economic or social and natural or physical environmental effects are interrelated." 40 C.F.R. § 1508.14. Defendants failed to satisfy these obligations here by failing to take the requisite "hard look" at the Phase IIb alternatives' impacts on nearby property values and rental income streams—economic impacts that are interrelated with the "natural or physical environmental effects" of the Phase IIb project.

The community of Rodanthe is heavily dependent on tourism. In particular, the area is a known hotspot for windsports, and many of the local homes and businesses derive substantial value from the use of this area for kiteboarding. *See, e.g.*, RD 28806 (comments of Amy Jones and Thomas Aschmoneit); RD 28810 (comments of Kel Shipman and Jim Meyer, and comments from Bette R. Gray); RD 28852 (comments of SOS OBX). This area is also renowned for its unobstructed sunsets over Pamlico Sound. *See, e.g.*, RD 28685–86 (comments of Richard Ayella); RD 28852 (comments of SOS OBX).

The proposed Jug-Handle Bridge would be a major man-made obstruction close to shore and would materially impair kiteboarding activities in Rodanthe. *See* RD 23492; 28658; 28797 (comments of Linda M. Grande and Paul P. Cudone); RD 28803 (comments of Carl and Polly Moffatt); RD 28804 (statement by Defendants acknowledging that Jug-Handle Bridge will have a recreational impact on kiteboarding). The Jug-Handle Bridge would also materially obscure

the views over Pamlico Sound and impair visitors' enjoyment of pristine sunsets.  *See* RD 28798 (comments of Kate Mercer, Bob and Chris Rowland, and Richard J. Ayella).  These impairments are likely to adversely impact tourism in Rodanthe and to drive down the property values and rental income streams of local homes.  *See* RD 28805–12 (numerous comments regarding adverse economic impact of Jug-Handle Bridge).

Despite the fact that these economic and social effects are closely interrelated with the Jug-Handle Bridge's environmental effects (*e.g.*, impairing windsports and views), none of the alternatives analyses address impacts of the project's recreational impairments on property values or income streams in Rodanthe.  The 2008 FEIS analyzed various economic impacts of a bridge in Rodanthe, but this analysis was woefully deficient.  AR 57511–17.

First, the 2008 FEIS limited the analysis of recreational impacts to recreational activities taking place in the Refuge, thereby impermissibly excluding recreational impacts in Rodanthe. AR 57432–37.  Second, although the 2008 FEIS considered impacts to certain recreational activities in the Refuge, it failed to consider the project's impacts on windsports, upon which the community of Rodanthe is economically reliant.  *Id*.  And third, even for the narrow set of recreational impairments in the Refuge that were considered, the economic impacts associated with these impairments were not considered as pertains to the community of Rodanthe.

Rather, the 2008 FEIS analyzed economic impacts on a more macro level—discussing impacts at various times on Hatteras Island, the Outer Banks, Dare County (including mainland portions) and the entire state of North Carolina.  *See* AR 57408–10; AR 57513–17.  No justification is provided for failing to analyze the economic impacts of recreational impairments on the community of Rodanthe.  Moreover, the failure to analyze the economic impacts of recreational impairments in Rodanthe stands in stark contrast to the 2008 FEIS's granular

consideration of other economic impacts—such as business displacement—specifically on the town of Rodanthe.  AR 57512.

In its comments submitted in response to the 2016 Revised Phase IIb EA, which identified the Jug-Handle Bridge as the preferred alternative for the first time, Plaintiff SOS OBX objected to Defendants' failure to evaluate the recreation-based economic effects on Rodanthe.  RD 28852–55.  EPA also raised concerns regarding the lack of economic impacts analysis, saying "it was difficult to compare the two alternatives without this information."  RD 23613.  Defendants nonetheless declined to conduct further NEPA analysis in order to take these impacts into consideration, summarily concluding without support that there would be no loss in tourism revenue to Dare County because the loss of recreational opportunities in the Phase IIb location would not preclude similar recreational opportunities in other areas of Dare County.  *Id.*; *see also* RD 23500–03.

This justification fails for two reasons.  First, the 2008 FEIS failed to consider the economic impacts of an impairment to windsports, either in Rodanthe specifically or in Dare County more broadly.  And second, Defendants' county-wide analysis of other recreational impacts fails to consider the unmitigated adverse economic impacts stemming from recreational impairments in Rodanthe.  While there may be alternative windsport areas elsewhere in the county, the interference with windsports in Rodanthe will have non-offsetting, adverse economic impacts on local properties.  And because these economic impacts are interrelated with "natural or physical environmental effects," CEQ regulations require that they be evaluated.  40 C.F.R. § 1508.14.  Because these impacts were not considered in the 2008 FEIS or the subsequent EAs, Defendants have failed to take the requisite "hard look" at the project's impacts.  *Robertson*, 490 U.S. at 350.

### III. Defendants Violated NEPA by Failing to Reevaluate Beach Nourishment as a Phase IIb Alternative in Light of Significant New Circumstances and Information.

In addition to impermissibly biasing their alternatives analysis and failing to properly disclose and evaluate a range of impacts, Defendants violated NEPA by failing to analyze beach nourishment as a reasonable alternative. An Environmental Impact Statement must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). Moreover, an Environmental Impact Statement must be supplemented if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. §§ 1502.9(c)(1)(i)–(ii).

Much of the analysis in the 2008 FEIS has been rendered obsolete by new information developed in the eight years between the FEIS and the Phase IIb ROD. The new information— including information regarding available sand sources for beach nourishment, the cost of beach nourishment, and updated shoreline-erosion projections—is highly relevant to the "reasonable[ness]" of beach nourishment as an alternative to the Jug-Handle Bridge. 40 C.F.R. § 1502.14(a). Because the decision to eliminate beach nourishment was based on outdated information set forth in the 2008 FEIS, beach nourishment should have been reevaluated, and Defendants' failure to include it as a reasonable alternative is arbitrary and capricious. Even if a Supplemental Environmental Impact Statement was not required, Defendants still violated NEPA by failing to take a "hard look" at beach nourishment in the context of the Environmental Assessments issued for Phase IIb. *Robertson*, 490 U.S. at 350.

### A. Material New Information Has Rendered Obsolete the Reasons for Eliminating Beach Nourishment from Detailed Study.

The Outer Banks are geologically dynamic and subject to rapid, unpredictable change. RD 953 (noting that "the project area is complex and the shoreline is constantly changing").

This unpredictability was a major reason that Defendants decided on the Transportation Management Plan as the selected alternative in 2009—facilitating an immediate replacement of the Bonner Bridge while postponing decisions on later phases, which would be "based on actual conditions existing . . . at the point in time that additional action becomes necessary."  AR 75561.  The 2010 Phase I EA reiterated the importance of analyzing alternatives in light of the most up-to-date information, explaining:

> Possible solutions for later phases of the project include bridging, road relocation, and/or beach nourishment.  All of these solutions, which are available for implementation as part of the Preferred Alternative, were identified and assessed as part of the [2008] FEIS and ***would be reassessed at the time decisions on future phases are being made.***

RD 953 (emphasis added).  *See also* RD 942 ("By actively monitoring the conditions and delaying decisionmaking, the environmental impacts can be better quantified, minimized, and mitigated."); RD 954 (stating that agency representatives "agreed that the various alternatives may need to be reassessed in the future as the shoreline and other landscape features continue to change"); RD 966 (explaining that the phase-based approach would "allow[] for future decisions to be based on actual data rather than predicted shorelines"); RD 23529 (stating that the phase-based approach "takes into account the inherent uncertainty in predicting future conditions within the dynamic coastal environment"); RD 11565 (stating that "the conditions in the Bonner Bridge Replacement Project (B-2500) project area will be constantly re-assessed to determine whether the next project phase should be implemented").

Despite Defendants' repeated assurances that they would reassess alternatives, including beach nourishment, at the time of decisions for future phases, the Merger Team agreed to eliminate beach nourishment from detailed study for Phase IIb at a meeting on December 15, 2011.  RD 2939 (press release); *see also* RD 3015 (Dec. 19, 2011 email from NCDOT project manager stating that nourishment had been eliminated).  This was nearly a year-and-a-half before

the first Phase IIb Environmental Assessment identified the Easement Bridge as the preferred alternative, and approximately five years before the Jug-Handle Bridge was selected.

The timing of the Merger Team's agreement is noteworthy. In December 2011 and January 2012, Defendants solicited public scoping comments on a range of Phase IIb alternatives, including beach nourishment. RD 6337. The handout for the scoping workshops disingenuously stated that "[t]he information you provide will help NCDOT develop the project by including input from all stakeholders ***prior to project decisions being made***. NCDOT considers a number of factors, including the public's comments, in making decisions." RD 6338 (emphasis added). NCDOT's summary of the scoping comments shows that the overwhelming majority of commenters supported beach nourishment as the long-term solution for Phase IIb. RD 4899. However, the Merger Team agreed to eliminate beach nourishment from detailed study on December 15, 2011, well before the conclusion of the scoping process. Thus, the scoping process was nothing more than a formality—a procedural façade designed to feign compliance with the requirement to "[i]nvite the participation of . . . interested persons." 40 C.F.R. § 1501.7(a)(1); *see also* RD 3015 (email from Plaintiff Mark Haines objecting to elimination of beach nourishment prior to final public meeting and in light of fact that public comments favored nourishment).

Moreover, even if the Merger Team's decision to eliminate beach nourishment from detailed study during the scoping process was procedurally valid under NEPA's baseline requirements (and it was not), the subsequent "new circumstances or information" required a revision of that determination and the issuance of a Supplemental EIS. *See* 40 C.F.R. § 1501.7(c); *id.* § 1502.9(c)(1)(ii). Specifically, the Merger Team based its decision to eliminate beach nourishment on a recommendation by an "expert panel" in October 2011, which in turn

based its recommendation to eliminate beach nourishment on uncertainties regarding a suitable sand source and concerns regarding shoreline erosion. RD 2888 ("The [Merger T]eam was informed that the expert panel agreed that the nourishment alternatives may not be viable due to the high erosion rate and a lack of a sand supply."). However, material new information, developed after the Merger Team's agreement to eliminate beach nourishment, has fundamentally altered the premises on which the Merger Team based its decision.

       1.    <u>Defendants failed to consider material new information regarding suitable sand sources.</u>

One of the primary reasons cited for the Merger Team's 2011 agreement to eliminate beach nourishment from detailed study was "uncertainties related to the availability of a suitable sand source . . . ." RD 11573. This uncertainty stemmed from the fact that the 2008 FEIS "did not include an independent investigation of sand resources for beach nourishment." AR 30503; *see also* AR 57320 (noting a sand source "off the coast near Rodanthe, but its quality, quantity, and suitability are not adequately known"). However, these "uncertainties" were eliminated in the summer of 2014, when the U.S. Army Corps of Engineers (the "Corps") led an emergency beach nourishment project at the S Curves—the precise stretch of NC-12 addressed by the instant Phase IIb project. RD 23461; RD 17365 (EA regarding emergency beach nourishment project). As Defendants themselves have acknowledged, during this emergency beach nourishment project, the Corps "identified sand sources within Wimble Shoals" that were "compatible with the native beach sand in the project area." RD 23461. Thus, the 2014 emergency beach nourishment project rendered obsolete a central premise underlying the Merger Team's decision to eliminate beach nourishment three years earlier.

Notably, the Corps also concluded that the beach nourishment project "would have no significant impacts" on the environment. RD 23461.

2.     <u>Defendants failed to consider material new information regarding the cost of beach nourishment.</u>

Likewise, the discovery of a suitable sand source during the 2014 emergency beach nourishment project provided material new information regarding the cost of beach nourishment as a Phase IIb alternative. The outdated study upon which the 2008 FEIS relied for cost analysis, which itself was drafted in 2005, "cautioned" the reader "to note that the unit cost for beach nourishment sand is difficult to predict, and given that it is a critical value in the total cost estimate, there can be significant differences between pre-project estimates and final costs." AR 30515. The author of the study further advised NCDOT that "[t]he [cost] estimate for Rodanthe could potentially be improved knowing the borrow material." RD 5783. A known "borrow material" for the S Curves was, in fact, determined during the Corps' emergency nourishment project in 2014. Yet Defendants failed to recalculate their cost estimates in light of the unit costs associated with this known borrow material.

In addition to failing to account for current information regarding available sand sources, the cost projections of beach nourishment as a Phase IIb alternative were also based on arbitrary methodologies. First, the 2008 FEIS assumed that nourishment would have to be repeated every four years. AR 57364. But as the underlying study states, "[t]his is a somewhat arbitrary number, and could be adjusted either up or down for either environmental or other reasons." AR 30503.

Second, the 2008 FEIS assumed that half of the dune would need to be repaired every third nourishment project, *i.e.*, every twelve years. AR 57363. But again, as the study on which this assumption was based cautions, "[t]his 12-year assumption is of course just an educated estimate and will depend upon the specific storms and conditions that occur." AR 30508; *see also* RD 956 ("Because of uncertainty regarding future storm events, additional coastal and

natural resource data will be collected and analyzed to evaluate the available range of alternatives for future phases.") (quoting amendment agreement). Despite the fact that multiple storms have in fact altered the geology of the project area since 2008, *see* RD 28619, RD 970, Defendants have failed to reexamine this 12-year assumption. Indeed, they have continued to rely on these outdated timing assumptions as recently as the Phase IIb ROD itself. RD 28628.

And third, the decision to eliminate beach nourishment from detailed study was made prior to any estimate of costs as applied only to Phase IIb. Rather, the only available cost estimates—which were flawed for the multitude of reasons discussed above—were based on beach nourishment along the entire NC-12 corridor from Oregon Inlet to Rodanthe. AR 57321 (2008 FEIS cost table); RD 2909 (cost table included in agenda for December 15, 2011 Merger Team meeting providing costs of alternatives based on entire length of NC-12 from Oregon Inlet to Rodanthe); RD 4923–24 (Feb. 2, 2012 notes stating that the costs are based on the "entire lengths of the alternatives" and that the costs will be updated for Phase IIb for the alternatives carried forward for detailed study). Without an analysis of beach nourishment's cost only as applied to Phase IIb, any cost comparison between beach nourishment, on the one hand, and the Easement Bridge or Jug-Handle Bridge, on the other hand, would be a misleading apples-to-oranges comparison.

In response to Plaintiff SOS OBX's comments on the 2016 Revised Phase IIb EA, Defendants balked at the request to reconsider beach nourishment. RD 28849–52. Rather, they doubled down on their flawed cost analysis by providing back-of-the-envelope calculations that ignore fundamental principles of finance. Specifically, Defendants stated:

> The short-term nourishment project [directed by the Corps in 2014] cost $20.3 million. This emergency nourishment project was designed by the USACE to last approximately three years and is on track to last between three and four years, depending on storm events. If it or a similar program were repeated every four

years at the same cost (12.5 times), the cost of 50 years of nourishment would be approximately $254 million. The Selected Alternative [the Jug-Handle Bridge] is estimated to cost $179 to $198 million.

RD 28851. Unlike bridge construction, beach nourishment takes place in installments extending decades into the future. *See* AR 57318–19. By simply multiplying $20.3 million by 12.5, without applying a discount rate to account for the time-value of money, Defendants grossly inflated the present-value cost of beach nourishment. *See* AR 26326 (cost table showing tremendous disparity between nominal costs and present-value costs of beach nourishment). In the very next sentence, Defendants compare this grossly inflated cost estimate for beach nourishment to the cost estimate for the Jug-Handle Bridge in order to erroneously demonstrate why beach nourishment is not cost-justified. This fundamental valuation error renders the cost comparison meaningless and renders arbitrary and capricious Defendants' decision to summarily reject a reassessment of beach nourishment. *See* AR 57318–19 (explaining that beach nourishment requires a higher discount rate than bridge alternatives).

3. <u>Defendants failed to consider material changes in shoreline-erosion projections.</u>

The shoreline-erosion projections that underlie the alternatives analysis in the 2008 FEIS are based on modeling data current through 2004. AR 57445; RD 11592. Subsequent shoreline-erosion projections are based on improved methodologies, RD 29295, and have forecasted significantly less erosion than was initially projected. For example, the 2016 Revised Phase IIb EA states that, based on data through 2014, the 2060 shoreline erosion is expected to be 350 to 590 feet less in Rodanthe, as compared to projections made in the 2008 FEIS. RD 23478. Likewise, as of 2014, the shoreline near the southern Refuge boundary was still approximately 170 feet farther east than the 2008 FEIS's projection of the 2010 shoreline. *Id.*

In other words, the 2008 FEIS grossly overestimated the extent of shoreline erosion in the Phase IIb project area. *See* RD 11576 ("[T]he erosion in the Rodanthe area through 2060 is now forecast to be less than was forecast for the 2008 FEIS and 2010 EA"); RD 23459 (noting that "the 2014 forecast line is approximately 50 to 140 feet further east (oceanward) of the 2011 forecast," which was itself significantly further east than the 2008 FEIS forecast); RD 23798–804 (graphs showing westward shift in shoreline erosions projections).[8] The 2008 FEIS states: "A risk that should be considered with respect to beach nourishment is that faster erosion than forecast is possible, which would result in more nourishment and therefore raise both the associated cost and sand required." AR 57323. Based on this principle, logic dictates that when, as here, actual erosion is *slower* than forecasted, less nourishment would be required, which would lower both the associated cost and sand required.

### B. Defendants' Failure to Issue a Supplemental EIS in Light of this Material New Information Is a Violation of NEPA.

The material new information regarding the availability of a suitable sand source, cost of beach nourishment, and fundamental changes in shoreline-erosion projections constitute "significant new circumstances or information" that necessitate (i) a revision of the determination to eliminate beach nourishment as a detailed study alternative, 40 C.F.R. § 1501.7(c), and (ii) the issuance a Supplemental EIS, *id.* § 1502.9(c)(1). Defendants' failure to "re-assess the project in light of the accurate data" constitutes a "failure to take a 'hard look'" as required by NEPA. *W. N.C. All. v. N.C. Dep't of Transp.*, 312 F. Supp. 2d 765, 777 (E.D.N.C.

---

[8] Notably, the shoreline-erosion projection is set at the upper end of a 95-percent confidence interval. AR 57445. Thus, even if one accepts the shoreline-erosion projections at face value—which one cannot do with the 2008 FEIS projections given the subsequent revisions—there is still a 97.5-percent chance that the actual erosion rate will be less severe than predicted.

2003). It also contradicts Defendants' own project-specific policy that future phases shall be determined "based on actual conditions existing . . . at the point in time that additional action becomes necessary." AR 75561; *see also* AR 30524 ("The uncertainty as to what will actually happen as the project proceeds is an important consideration when evaluating the beach nourishment alternative."). Defendants' decision not to consider these changed circumstances and instead to continue to rely on analyses that were 8 to 11 years old, is arbitrary and capricious.

The Fourth Circuit has adopted a two-part test to determining whether an agency must prepare a Supplemental EIS. "First, the court must determine whether the agency took a hard look at the proffered new information. Second, if the agency did take a hard look, the court must determine whether the agency's decision not to prepare a supplemental EIS was arbitrary or capricious." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). A violation occurs if the agency fails either of these prongs—Defendants have failed both.

As an initial matter, Defendants failed to take a hard look at the new information regarding sand suitability, cost, and shoreline-erosion projections. Rather than meaningfully consider the need to reevaluate beach nourishment in light of this new information, Defendants have clung to the Merger Team's premature and outdated decision to eliminate beach nourishment. *See* RD 28628.[9] *North Carolina Alliance for Transportation Reform, Inc. v.*

---

[9] Defendants' other reasons for refusing to reevaluate beach nourishment likewise fall short of the hard look required by NEPA. For example, Defendants summarily brushed aside the updated shoreline-erosion projections by concluding that "the Phase IIb area is still considered vulnerable to damage because of long term erosion." RD 28850. While the road may still be vulnerable in the absence of any action, Defendants have failed to analyze whether beach nourishment is a more viable option for curing such vulnerability in light of the reduced erosion projections. Defendants likewise downplay the Corps' 2014 emergency nourishment project by stating that the Phase IIb project could not be deemed an emergency.

*United States Department of Transportation*, 151 F. Supp. 2d 661, 675 (M.D.N.C. 2001), is

instructive. There, the court held that FHWA and NCDOT violated NEPA by failing to explain

their failure to supplement an FEIS following an announcement that a highway project did not

conform with the Clean Air Act. Because the agencies did not take "a hard look at how the new

information . . . might affect the . . . [NEPA] analysis," they violated NEPA's supplementation

requirement. *Id.* at 699. Similarly, Defendants here did not consider the effects that the new

information regarding sand suitability, cost, and shoreline-erosion projections might have on the

decision to eliminate beach nourishment from detailed study. Indeed, neither the 2013 Phase IIb

EA nor the 2016 Revised Phase IIb EA examined these issues at all. Only in response to

comments on the 2016 Revised Phase IIb EA did Defendants even acknowledge the new

information—but even then, only in the course of summarily dismissing beach nourishment by

peddling an erroneous cost analysis and clinging to the woefully outdated information underlying

the Merger Team's decision. *See* RD 28849–52.

  But even if Defendants had taken a hard look at the new information regarding sand

suitability, cost, and shoreline-erosion projections, the decision not to prepare a Supplemental

EIS was arbitrary and capricious in that it was based largely on the fact that the Merger Team

had ruled it out years prior. The whole point of a Supplemental EIS is to evaluate alternatives in

light of new information that was not available at the time that prior NEPA analysis was

conducted. As the Supreme Court has explained, "[i]t would be incongruous with th[e] approach

to environmental protection, and with [NEPA's] manifest concern with preventing uninformed

---

RD 28851. However, Defendants failed to explain how the lack of "emergency" status
changes the fact that the project "would have no significant impacts." This type of cursory
analysis is no substitute for the Supplemental EIS required when, as here, material new
information has come to light.

action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

When the Merger Team agreed to eliminate beach nourishment from detailed study in 2011, the 2014 nourishment project at the S Curves had not yet occurred. Thus, the Merger Team was not privy to the data points regarding sand suitability and cost that were developed during the course of that project. Likewise, the Merger Team was not aware of yet-to-be-created shoreline-erosion projections that showed lower rates of erosion. By relying on the Merger Team's decision to eliminate beach nourishment as a major reason for not reevaluating beach nourishment, Defendants have ignored the fundamental point of NEPA's supplementation requirements—to reconsider prior decisions in light of new information.

This refusal is particularly troubling given NCDOT's acknowledgement in 2013 that it would continue to reevaluate beach nourishment based on insights gleaned from nourishment projects at Nags Head, over 25 miles north of the Phase IIb area. RD 9372. A year later, in 2014, site-specific data became available regarding the ***exact location*** at issue in the Phase IIb project. *Compare* RD 48 (map of emergency beach nourishment project) *with* RD 23439, 23448 (maps of Phase IIb long-term project). It makes no sense for NCDOT to acknowledge the importance of reevaluting beach nourishment in light of nourishment projects dozens of miles away, while summarily refusing to reevaluate beach nourishment in light of a nourishment project that occurred zero miles away. Nonetheless, that is precisely what Defendants have done. Defendants have accepted the Merger Team's 2011 elimination of beach nourishment as sacrosanct—never mind that this agreement was made prior to the completion of scoping comments, prior to the discovery of highly relevant information regarding the reasonableness of

45

beach nourishment, and over four years before the Revised Phase IIb EA and ROD were issued. RD 11571.

C. **Regardless of Whether They Were Required to Issue a Supplemental EIS, Defendants Violated NEPA by Failing to Take a Hard Look at Whether to Reevaluate Beach Nourishment as a Phase IIb Alternative.**

Even if a Supplemental EIS was not required, Defendants still would have been required to evaluate beach nourishment in the Phase IIb EA. Defendants have summarily rejected a reevaluation of beach nourishment on the basis of the Merger Team's agreement to eliminate this alternative from detailed study in 2011. RD 28628. But by the time the 2016 Revised Phase IIb EA was issued in May 2016, the premises underlying the Merger Team's elimination of beach nourishment had been rendered obsolete by the revised shoreline-erosion projections and the new information derived from the Corps' 2014 emergency beach nourishment project at the S Curves. By continuing to rely on an outdated decision without the benefit of material new information, Defendants restored their analytical "blinders" prior to selecting a final Phase IIb alternative. *Marsh*, 490 U.S. at 371. In so doing, Defendants failed to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). And by ignoring material changes in information, Defendants acted arbitrarily and capriciously in determining that Phase IIb involved no "new, significant impacts." *See* RD 28666.

D. **Defendants Violated Section 4(f) by Failing to Consider Avoidance Alternatives and Failing to Select the Least Overall Harm Alternative.**

The Jug-Handle Bridge will occupy 2.79 acres of new easement within the Refuge, and cause the installation and use of haul roads through the Rodanthe Historic District, RD 28641, RD 26–27, not to mention the 2.4-mile structure that will be erected in Pamlico Sound, RD 28634–37.

Beach nourishment, which was prematurely eliminated and for which Defendants improperly failed to conduct a Supplemental EIS, was impermissibly excluded from the Section 4(f) Evaluation for Phase IIb.  *See* RD 23532–57 (analyzing only the Easement Bridge and Jug-Handle Bridge for purposes of Section 4(f)).  Critically, beach nourishment has been "determined not to adversely affect the Refuge," RD 11516, and to have "no significant impacts" on the environment, RD 23461.  There is likewise no indication that beach nourishment would involve any use of the Rodanthe Historic District.  *See* RD 11581 (noting that Corps' emergency nourishment project at the S Curves "would not affect historic resources"); RD 927 (map of project area showing beach nourishment taking place much farther away from the Rodanthe Historic District than the Jug-Handle Bridge).  Thus, beach nourishment is a "feasible and prudent avoidance alternative" to the Jug-Handle Bridge's use of the Rodanthe Historic District, and constitutes less "overall harm" to Section 4(f) properties taken together.  23 C.F.R. § 774.3(c)(1).

Similarly, the Easement Bridge would remain in the existing easement and would not entail any new easement expansion within the Refuge.  As Defendants admit, the Easement Bridge would not entail any actual use of the Refuge, RD 23537, but rather only a constructive use in that it would create a visual impairment that detracts from the historic qualities of the Refuge, RD 23539–40.  Defendants have also stated that the Easement Bridge would result "in the least initial direct impact to natural habitat as compared to the other . . . options."  RD 23486. Moreover, there is nothing in the record indicating that the Easement Bridge would entail the use of haul roads through the Rodanthe Historic District.  Taken together, the Easement Bridge is less harmful to Section 4(f) properties than is the Jug-Handle Bridge.  *See* 23 C.F.R. § 774.3(c)(1).

By failing to even include beach nourishment in the Section 4(f) Evaluation for Phase IIb, Defendants failed to properly analyze which alternatives avoid Section 4(f) properties and constitute the least overall harm. In addition, by selecting an alternative that has greater impacts on Section 4(f) properties than either the Easement Bridge or beach nourishment, Defendants violated Section 4(f)'s substantive requirement to select the least overall harm alternative. 23 C.F.R. § 774.3(c)(1).

## **CONCLUSION**

For the reasons articulated above, the Court should grant Plaintiffs' motion.

Dated:  January 10, 2018                     Respectfully submitted,

/s/ Michael K. Murphy
Michael K. Murphy
  D.C. Bar No. 468907
  MMurphy@gibsondunn.com
Bryson C. Smith
  D.C. Bar No. 1025120
  BSmith@gibsondunn.com
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 530-9657
Counsel for Plaintiffs

/s/ Zia C. Oatley
Zia C. Oatley
KEAN MILLER, LLP
909 Poydras Street
Suite 3600
New Orleans, LA 70112
Tel: (504) 620-3346
Fax: (504) 620-3198
Zia.Oatley@keanmiller.com
NC Bar No. 44664
Local Civil Rule 83.1 Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of January, 2018, I electronically filed a copy of the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing, and pursuant to Local Civil Rule 5.1(e), shall constitute service upon, the following:

John G. Batherson
Colin Justice
North Carolina Department of Justice
1505 Mail Service Center
Raleigh, NC 27699
**Counsel for Defendants North Carolina Department of
Transportation and James H. Trogdon, III,
in his official capacity as Secretary of NCDOT**

Carter Fleeth Thurman
Neal Fowler
U.S. Department of Justice
601 D Street NW
Washington, D.C. 20001
**Counsel for Defendants Federal Highway Administration and
John F. Sullivan, III, in his official capacity as Division Administrator
of FHWA**

Derb S. Carter, Jr.
Kimberley Hunter
Nicholas S. Torrey
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
**Counsel for Defendant-Intervenors Defenders of Wildlife and
National Wildlife Refuge Association**

This the 10th day of January, 2018.

/s/ Bryson C. Smith
Bryson C. Smith