IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:17-CV-00004-FL

| | |
|---|---|
| SAVE OUR SOUND OBX, INC., THOMAS ASCHMONEIT, RICHARD AYELLA, DAVID HADLEY, MARK HAINES, JER MEHTA, and GLENN STEVENS, | |
| Plaintiffs, | |
| v. | |
| NORTH CAROLINA DEPARTMENT OF TRANSPORTATION, JAMES H. TROGDON, III, in his official capacity as Secretary of the North Carolina Department of Transportation, FEDERAL HIGHWAY ADMINISTRATION, and JOHN F. SULLIVAN, III, in his official capacity as Division Administrator for the Federal Highway Administration, | STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| Defendants, | |
| and | |
| DEFENDERS OF WILDLIFE and NATIONAL WILDLIFE REFUGE ASSOCIATION, | |
| Defendant-Intervenors. | |

1.      The Record of Decision for Phase IIb of the Bonner Bridge Replacement Project

authorizes the construction of a 2.4-mile bridge, shaped like a jug handle, in Pamlico Sound near

Rodanthe, North Carolina.  RD 28634–37; RD 23492.  The Record of Decision was executed on

December 15, 2016.  RD 28666.

2.　　The Jug-Handle Bridge is estimated to cost between $179.3 million and $198.3 million.  RD 23528.

3.　　The project involves changes to North Carolina Highway 12 ("NC-12"), which runs north-to-south along the Outer Banks of North Carolina.  AR 57226.

4.　　The Bonner Bridge, which was completed in 1963, spans Oregon Inlet and connects Bodie Island to Hatteras Island.  Without this bridge, Hatteras Island would have no road connection to the mainland.  AR 57230–31.

5.　　In 1990, NCDOT began studying replacement alternatives for the Bonner Bridge, which had deteriorated significantly since its initial construction.  AR 83406.

6.　　After issuing several draft Environmental Impact Statements, Defendants in 2008 released a Final Environmental Impact Statement (the "2008 FEIS") for the Bonner Bridge Replacement Project.  AR 57225.

7.　　This project's purported purpose was to provide a long-term replacement for the Bonner Bridge.  AR 57230.

8.　　In order to ensure the sustainability of a replacement bridge, the 2008 FEIS also considered, at a high level, alternatives for maintaining the NC-12 corridor from Rodanthe to Oregon Inlet.  *See* AR 57250–397.

9.　　The 2008 FEIS included a Final Section 4(f) Evaluation, AR 57672, assessed several alternatives, AR 57250–392, and identified the Parallel Bridge Corridor with Phased Approach/Rodanthe Bridge as the preferred alternative, AR 57396–97.

10.　　A year later, in October 2009, a Revised Final Section 4(f) Evaluation was released, AR 75556, adding a new detailed study alternative—the Parallel Bridge Corridor with

NC-12 Transportation Management Plan—and selecting it as the preferred alternative, AR 75560–61.

11.     Pursuant to the Parallel Bridge Corridor with NC-12 Transportation Management Plan, the Bonner Bridge over Oregon Inlet would be replaced ("Phase I") as soon as possible, with later phases to be determined "based on actual conditions existing . . . at the point in time that additional action becomes necessary."  AR 75561; RD 937.

12.     Defendants noted that "the current global sea level analytical models are not fully developed to predict local effects," which results in "uncertainty associated with estimating future sea levels and shoreline locations."  AR 75561.  Defendants cited this uncertainty as a reason for postponing decisions on future phases.  AR 75561.

13.     In May 2010, Defendants released an Environmental Assessment for Phase I (the "2010 Phase I EA"), RD 906, and the Bonner Bridge replacement was officially approved in a Record of Decision issued in December 2010, AR 91519.

14.     In July 2011, Defendant-Intervenors—represented by the Southern Environmental Law Center ("SELC")—filed suit in this Court (the "Bonner Bridge Suit") seeking declaratory and injunctive relief for alleged violations of NEPA and Section 4(f) stemming from the Phase I approval process. *Defs. of Wildlife v. N.C. Dep't of Transp.*, No. 11-cv-00035 (E.D.N.C. filed July 1, 2011).

15.     In 2013, this Court ruled in favor of Defendants,[1] *Defs. of Wildlife v. N.C. Dep't of Transp.*, 971 F. Supp. 2d 510 (E.D.N.C. 2013), and Defendant-Intervenors appealed to the

---

[1] Eugene Conti, Jr., was the Secretary of NCDOT when the Bonner Bridge Suit was filed. He was therefore named as a defendant in his official capacity, whereas James H. Trogdon, III, is the NCDOT official named as a defendant in the instant suit. The other three defendants— NCDOT, FHWA, and John F. Sullivan, III—are the same in both suits.

U.S. Court of Appeals for the Fourth Circuit. The Fourth Circuit affirmed in part, reversed in part, and remanded back to this Court. *Defs. of Wildlife*, 762 F.3d 374. Specifically, the Fourth Circuit affirmed this Court's holding that Defendants had not unlawfully segmented their analysis in violation of NEPA, *id.* at 398, while reversing this Court's holding that Defendants had established a joint planning exception that partially precluded the applicability of Section 4(f) to the portion of NC-12 in the Pea Island National Wildlife Refuge (the "Refuge"), *id.* at 402.

16.    In August 2011, Hurricane Irene struck the North Carolina coast and damaged NC-12 in two locations—in northern Rodanthe at the S Curves and within the Refuge approximately six miles south of Oregon Inlet. RD 11560–61.

17.    In February 2013, Defendants issued an Environmental Assessment for Phase IIa, which was intended to provide long-term improvements to the damaged stretch of NC-12 within the Refuge six miles south of Oregon Inlet.[2] RD 29232.

18.    A Record of Decision for Phase IIa was issued in October 2013. RD 10739.

19.    Throughout various phases of the Bonner Bridge Replacement Project, a Merger Team has made decisions regarding the next steps forward. This Merger Team consists of representatives from the federal and state environmental resource and regulatory agencies that have an interest in the Bonner Bridge Replacement Project: FHWA, NCDOT, the U.S. Fish and Wildlife Service, the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, the National Marine Fisheries Service, the National Park Service, the North Carolina Department

---

[2]  The 2013 Phase IIa EA was unintentionally omitted from the Administrative Record. *See* D.E. 61-2. Defendant FHWA has provided Plaintiffs with a Bates-stamped copy of this document and has represented that it is also providing the Court with a copy and will supplement the Administrative Record accordingly.

of Cultural Resources, the North Carolina Department of Environment and Natural Resources ("NCDENR") – Wildlife Resources Commission, the NCDENR – Division of Water Quality, the NCDENR – Division of Coastal Management, and the NCDENR – Division of Marine Fisheries. AR 57711.

20.     The Merger Team is jointly led by FHWA, NCDOT, NCDENR, and the Corps of Engineers, RD 18089, and "[t]hese agencies are the primary decision-making authority with regard to NEPA and Section 404 permitting," RD 18093.

21.     In the event that the Merger Team cannot reach a consensus on a particular decision point regarding the project, the issue is decided by the Dispute Resolution Board, which consists of representatives of the Merger Team's four lead agencies—FHWA, NCDOT, NCDENR, and the Corps of Engineers.  RD 935–36; *see also* AR 63021–23.

22.     The Merger Team process provides that "Concurrence Point[s] 3 [the LEDPA designation] . . . occur[s] ***after*** public and agency review processes for a draft document."  AR 57712 (emphasis added).

23.     At a meeting on December 15, 2011, the Merger Team agreed to eliminate from detailed study beach nourishment and beach nourishment combined with a bridge within the existing easement, thereby leaving the Jug-Handle Bridge and the Easement Bridge as the only remaining detailed study alternatives for Phase IIb.  RD 2939 (press release); *see also* RD 3015 (Dec. 19, 2011 email from NCDOT project manager stating that nourishment had been eliminated).

24.     Defendants solicited public scoping comments regarding Phase IIb during December 2011 and January 2012.  RD 6337.  The handout for the scoping workshops stated that "[t]he information you provide will help NCDOT develop the project by including input from all

stakeholders prior to project decisions being made. NCDOT considers a number of factors, including the public's comments, in making decisions." RD 6338.

25.     The majority of commenters supported beach nourishment as the long-term solution. RD 4899; RD 2888. Specifically, 29 people expressed a preference for beach nourishment, 9 expressed a preference for the Jug-Handle Bridge, 7 expressed a preference for the Easement Bridge, and 6 expressed a preference for the Easement Bridge combined with beach nourishment. RD 4899. But the scoping process was not completed until after the Merger Team had already agreed to eliminate beach nourishment from detailed study. RD 2939; RD 3015.

26.     In December 2013, Defendants issued an Environmental Assessment for Phase IIb, addressing improvements to NC-12 in the S Curves just north of Rodanthe (the "2013 Phase IIb EA"). RD 11542.

27.     The 2013 Phase IIb EA did not evaluate beach nourishment or beach nourishment combined with a bridge within the existing easement as detailed study alternatives. RD 11571.

28.     Between the two Phase IIb detailed study alternatives—the Easement Bridge and the Jug-Handle Bridge[3]—the 2013 Phase IIb EA identified the Easement Bridge as the preferred alternative. RD 11586–87; *see also* RD 11572 (diagram showing Easement Bridge and Jug-Handle Bridge alternatives).

29.     After the 2013 Phase IIb EA was issued, NCDOT attempted to arrange a Merger Team meeting regarding the designation of the least environmentally damaging practicable alternative, or LEDPA. RD 11758.

---

[3] The selected Jug-Handle Bridge is closer to the shoreline than the Jug-Handle Bridge alternative assessed in the 2013 Phase IIb EA. *Compare* RD 11572 (2013 version), *with* RD 28629 (selected version).

30.     After issuing the Phase IIb EA, NCDOT had initially planned to award a design-build contract for the Easement Bridge by the spring of 2014.  RD 11732.

31.     Before the Easement Bridge was designated as the LEDPA, Defendants entered into a settlement agreement (the "Settlement Agreement") with Defendant-Intervenors regarding the Bonner Bridge Suit.  RD 16622.

32.     Defendants' decision-making process regarding Phase IIb was postponed during the course of the negotiations regarding the Settlement Agreement.  RD 16238; RD 16576; RD 17060.

33.     The Settlement Agreement, executed on April 30, 2015, RD 16638, required NCDOT to "identify Phase IIb Bridge on New Location [*i.e.*, the Jug-Handle Bridge] as its preferred alternative and seek Merger Team Concurrence Point 3," RD 16624 ¶ 1(c).

34.     As expressed in the Merger Team Memorandum of Understanding, RD 18088, Concurrence Point 3 is the identification of the LEDPA.  RD 18091.

35.     The Settlement Agreement further required the NCDENR – Division of Coastal Management, to "provide a written statement of [its] support and preference for [the Jug-Handle Bridge]" and to "otherwise . . . use best efforts to help NCDOT attempt to secure Merger Team concurrence."  RD 16624–25 ¶ 1(e).

36.     Only if the Jug-Handle Bridge was identified as the LEDPA, among other commitments required of Defendants, were the Defendant-Intervenors obligated to dismiss the Bonner Bridge Suit, thereby allowing the Bonner Bridge replacement to proceed unchallenged. RD 16625 ¶ 1(h).

37.     Defendant-Intervenors support the shifting of NC-12 from the Pea Island National Wildlife Refuge to Pamlico Sound, thereby allowing the Refuge to revert to nature.  RD 23872.

38.     The Jug-Handle Bridge alternative would entail moving a short stretch of NC-12 from the current easement to a bridge over Pamlico Sound, thereby eliminating part of NC-12 from the Refuge and opening the possibility of a future extension to the Jug-Handle Bridge that would remove further stretches of highway from the Refuge. *See* RD 16627 ¶ 3(c)(iii) (requiring NCDOT, in the event the Jug-Handle Bridge is identified as the LEDPA, to plan, design, and construct the Jug-Handle Bridge "so as not to preclude the addition of a later extension into the Pamlico Sound to the north").

39.     The Settlement Agreement also required Defendants to rescind their contract for construction of the Phase IIa project, for which a Record of Decision had already been issued in October 2013. RD 16623. The rescission of the Phase IIa contract forestalled plans to construct a new permanent bridge in the Refuge six miles south of Oregon Inlet, thereby keeping the door open to removing this section of NC-12 from the Refuge as part of a future extension of the Jug-Handle Bridge. *See* RD 23462.

40.     NCDOT has publicly described the LEDPA designation as being equivalent to an "agreement on which alternative will be built." RD 11765.

41.     The Merger Team's Memorandum of Understanding states, "Having concurred at a particular milestone, a [Merger Team] member will not request to revisit previous concurrence points unless there is substantive new information that warrants a reevaluation." RD 18089.

42.     After the Settlement Agreement was executed, NCDOT began to seek concurrence from the Merger Team that the Jug-Handle Bridge was the LEDPA. RD 16654.

43.     Defendants considered the Settlement Agreement negotiations during the Phase IIb decision-making process. *See* RD 16383 (Feb. 16, 2015 email expressing the possibility of "revising our preferred [alternative] to the Bridge on New Location" based on litigation over the

8

Bonner Bridge and stating that "[a]s settlement discussions continue, I think we need to prepare ourselves to quickly get in front of the merger team to make a decision on either of the alternatives."); RD 16986 (June 18, 2015 NCDOT email soliciting concurrence from Albemarle Commission and explaining that "SELC's clients have agreed to drop the federal and state lawsuits under certain conditions," including "that we reach concurrence on the 'Bridge in the Sound' [*i.e.*, Jug-Handle Bridge] alternative as the Least Environmentally Damaging Practicable alternative").

44.     In June 2015, less than two months after the Settlement Agreement was executed, the Merger Team identified the Jug-Handle Bridge as the LEDPA.  RD 16912; RD 23565.

45.     In August 2015, a joint stipulation of dismissal of Defendant-Intervenors' claims was filed in the Bonner Bridge Suit.  Ex. A.

46.     Construction of the Bonner Bridge replacement commenced in March 2016.  RD 23438.

47.     The Settlement Agreement further provided that, in the event that the Merger Team concurred that the Jug-Handle Bridge was the Phase IIb LEDPA, NCDOT and FHWA must "promptly revise" the Section 4(f) Evaluation and "associated environmental document prepared pursuant to NEPA" (i.e., a revised EIS or EA) by identifying the Jug-Handle Bridge as the preferred alternative, in addition to "[p]ropos[ing] to identify the Phase IIb [Jug-Handle Bridge] Alternative as the 'least overall harm' alternative."  RD 16626–27 ¶¶ 3(c)(i)(1), (3).

48.     Only if Defendants selected the Jug-Handle Bridge as the final Phase IIb alternative did Defendant-Intervenors agree not to file a new suit challenging the Phase IIb decision.  RD 16625 ¶ 2(b); *see also* RD 25193 (SELC comments on the Revised EA stating that

"SELC will not challenge the validity of the Environmental Assessment if the agencies move ahead with the Bridge on New Location Alternative as the Selected Alternative for Phase IIb").

49.    Defendants identified the Jug-Handle Bridge as their Phase IIb preferred alternative in a Revised Phase IIb EA issued on May 24, 2016.  RD 23418.

50.    The 2016 Revised Phase IIb EA states that it "takes into account" the terms of the Settlement Agreement but that "[t]he stipulations did not predetermine the choice of the [Jug-Handle Bridge] Alternative as the Preferred Alternative."  RD 23443.

51.    Defendants considered the possibility of a challenge to the Phase IIb decision by Defendant-Intervenors.  *See* RD 25194 (internal NCDOT email reporting the "[g]ood news" that "SELC is happy with the Revised EA" and would not sue as long as the Jug-Handle Bridge was chosen as the selected alternative).

52.    Defendants confirmed the Jug-Handle Bridge as the Selected Alternative in the Phase IIb Record of Decision signed on December 15, 2016.  RD 28613.

53.    Defendants issued the Phase IIb Record of Decision after concluding that "the modifications and changes assessed in the Revised Phase IIb EA do not result in any new, significant impacts not previously identified" in the 2008 FEIS.  RD 28666.

54.    The 2008 FEIS contained extensive analysis of the construction process, as opposed to just the final product, of the Bonner Bridge replacement under Phase I.  AR 57349– 62, 57662–68.

55.    Included in the analysis of the construction process for the Bonner Bridge replacement was an evaluation of the impacts of using haul roads during the construction of the Bonner Bridge replacement.  AR 57268, 57276, 57360–61, 57379, 57667–68.  This evaluation

indicated the precise dimensions of the proposed haul road and provided that the road would be filled and revegetated after completion of the project. AR 57360.

56.     The Administrative Record contains two diagrams depicting haul roads for the Phase IIb project. RD 26–27.

57.     The Administrative Record, however, does not contain any evaluation of the impacts of the haul roads depicted in the construction diagrams, RD 26–27, any other specific haul roads for Phase IIb, or haul roads generally for Phase IIb. Nor does the Administrative Record contain an evaluation of the impacts of transporting construction materials during the Phase IIb construction process.

58.     Neither the 2013 Phase IIb EA, the 2016 Revised Phase IIb EA, nor the Phase IIb Record of Decision discloses that haul roads may be used during Phase IIb. RD 11542; RD 23418; RD 28613. Nor do these documents otherwise disclose or analyze the impacts of transporting construction materials.

59.     While Defendants have stated that the Jug-Handle Bridge project would avoid the Rodanthe Historic District, RD 23542, one of the construction diagrams depicts a "ferry terminal modified to accept barge deliveries" just to the west of the Rodanthe Historic District, RD 26–27. This diagram also show two parallel "haul roads" that are plotted to run from the ferry terminal to the southern terminus of the Jug-Handle Bridge, cutting directly through the Rodanthe Historic District and an adjacent wetlands area. RD 26; *see also* AR 57402 (map delineating boundaries of Rodanthe Historic District). The diagram further indicates that a crane will be required to unload construction equipment from the barges.

60.     The construction of the Jug-Handle Bridge is planned to last between three and three-and-a-half years. RD 28663.

61.     The Rodanthe Historic District is eligible for listing on the National Register.  RD 28652.

62.     Plaintiffs regularly visit sites located within and appreciate the historic attributes of the Rodanthe Historic District.  Ex. B ¶¶ 13–14 (Decl. of Mark Haines); Ex. C ¶¶ 3–11 (Decl. of Thomas Aschmoneit; Ex. E ¶¶ 9–10 (Decl. of Jer Mehta); Ex. G ¶ 7 (Decl. of Richard Ayella).

63.     Defendants have concluded that the Jug-Handle Bridge would have no adverse effect on the Rodanthe Historic District.  RD 23498; RD 28640.  In reaching this conclusion, Defendants did not evaluate whether the haul roads would have an adverse effect on the Rodanthe Historic District.

64.     The Administrative Record contains no indication that Defendants disclosed to the Advisory Council on Historic Preservation any plans to transport construction materials through the Rodanthe Historic District.

65.     The Section 106 Programmatic Agreement for the Bonner Bridge Replacement Project provides that "[t]he Undertaking will be designed in a manner that keeps subsequent phases of the project out of the limits of the Rodanthe Historic District."  RD 5364.

66.     The contractor for the Jug-Handle Bridge submitted the following question to Defendants prior to the execution of the construction contract:  "If the contractor proposes access through historic areas, would SHPO [State Historic Preservation Office] consider that an impact?"  RD 19699.

67.     The Administrative Record does not contain an answer by Defendants to the contractor's question regarding access through historic areas.

68.     The Final Request for Proposals ("RFP") for Phase IIb contains information regarding the use of haul roads, including certain requirements of haul roads.  *See* RD 24840,

24851–52.  But the RFP does not include requirements that haul roads avoid the Rodanthe Historic District nor requirements that any such roads be designed in a manner that mitigates impacts.

69.     The Administrative Record in this action contains no additional information regarding the applicability of the joint planning exception that was not included in the record for the Bonner Bridge Suit.

70.      In updating the Section 4(f) Evaluation for the 2016 Revised Phase IIb EA, Defendants removed the 2013 Phase IIb EA's statements that the joint planning exception precludes any Section 4(f) use of the Refuge as a refuge.  *See* RD 17327–28.  But the 2016 Revised Phase IIb EA does not contain any material analysis of the project's refuge-related impacts on the Refuge that were not included in the 2013 Phase IIb EA.  *Compare* RD 11639–42, *with* RD 23537–41.

71.     Defendants note in the Section 4(f) Evaluation for Phase IIb that "[p]ermanent loss of wildlife habitat in the new easement would be 0.01 acre of pile impact (0.30 acre if assuming the larger pile cap area)."  RD 11639; RD 23537.  However, there is no analysis of whether, and to what extent, this loss of habitat would impact the wildlife that the Refuge is intended to protect.  The Section 4(f) Evaluation also does not evaluate proximity impacts such as noise and visual impacts from the Jug-Handle Bridge that may impact wildlife patterns within the Refuge.  RD 23537–41.

72.     The Section 4(f) Evaluation does evaluate proximity impacts such as visual obstructions on the Refuge's attributes as an historic resource.  RD 23540.

73.     Plaintiff Save Our Sound OBX, Inc. ("SOS OBX") is a non-profit corporation dedicated to preserving Pamlico Sound.  It has approximately 30 members, including some who are individual plaintiffs in this action.  Ex. B ¶¶ 3–5 (Decl. of Mark Haines).

74.     Each of the individual plaintiffs owns and/or regularly visits properties in close proximity to the site of the proposed Jug-Handle Bridge.  Ex. B ¶¶ 2, 16 (Decl. of Mark Haines); Ex. C ¶¶ 2, 14 (Decl. of Thomas Aschmoneit); Ex. D ¶¶ 2, 5 (Decl. of David Hadley); Ex. E ¶¶ 2–3, 12 (Decl. of Jer Mehta); Ex. F ¶¶ 2, 5, 9 (Decl. of Glenn Stevens); Ex. G (Decl. of Richard Ayella).

75.     Rodanthe offers unobstructed sunsets over Pamlico Sound.  *See, e.g.*, RD 28685–86 (comments of Richard Ayella); RD 28852 (comments of SOS OBX).

76.     The Jug-Handle Bridge would pose a visual impairment of the Rodanthe sunset experience.  *See* RD 28798 (comments of Kate Mercer, Bob and Chris Rowland, and Richard J. Ayella).

77.     The community of Rodanthe is also a popular destination for windsports.  *See, e.g.*, RD 28806 (comments of Amy Jones and Thomas Aschmoneit); RD 28810 (comments of Kel Shipman and Jim Meyer, and comments from Bette R. Gray); RD 28852 (comments of SOS OBX).

78.     Plaintiffs regularly participate in a wide range of recreational activities within Pamlico Sound and Pea Island National Wildlife Refuge.  Ex. B ¶¶ 7–12 (Decl. of Mark Haines); Ex. C ¶¶ 3–11 (Decl. of Thomas Aschmoneit); Ex. D ¶¶ 4 (Decl. of David Hadley); Ex. E ¶¶ 5–8 (Decl. of Jer Mehta); Ex. F ¶ 5 (Decl. of Glenn Stevens); Ex. G (Decl. of Richard Ayella).

79.     The Jug-Handle Bridge would constitute a man-made obstruction close to shore and would materially impair kiteboarding activities in Rodanthe.  *See* RD 23492; 28658; 28797

(comments of Linda M. Grande and Paul P. Cudone); RD 28803 (comments of Carl and Polly Moffatt); RD 28804 (statement by Defendants acknowledging that Jug-Handle Bridge will have a recreational impact on kiteboarding).

80.     The public has concerns that these aesthetic and recreational impairments are likely to adversely impact tourism in Rodanthe and to drive down the property values and rental income streams of local homes.  *See* RD 28805–12 (numerous comments regarding adverse economic impact of Jug-Handle Bridge).

81.     The 2008 FEIS did not analyze impacts to recreational activities in Rodanthe, outside of the Refuge.  *See* AR 57432–37.

82.     Although the 2008 FEIS considered impacts to certain recreational activities in the Refuge, it did not evaluate the project's impacts on windsports.

83.     The 2008 FEIS did not analyze the economic impacts of recreational impairments on the community of Rodanthe.  *See* AR 57408–10; AR 57513–17.  Rather, the 2008 FEIS analyzed economic impacts of recreational impairments on a more macro level—alternating between Dare County, Hatteras Island, the Outer Banks, and the state of North Carolina.  *See* AR 57408–10; AR 57513–17.

84.     The 2008 FEIS did analyze the economic impacts of non-recreational impairments on the community of Rodanthe, such as business displacement.  AR 57512.  The 2008 FEIS does not provide a rationale for considering the economic impacts on Rodanthe of certain non-recreational impairments, but not the economic impacts of recreational impairments.

85.     In its comments submitted in response to the 2016 Revised Phase IIb EA, Plaintiff SOS OBX objected to Defendants' failure to evaluate the recreation-based economic effects on Rodanthe.  RD 28852–55.

86. EPA also raised concerns regarding the lack of economic impacts analysis, saying "it was difficult to compare the two alternatives without this information." RD 23613.

87. Defendants declined to conduct further NEPA analysis in order to take these impacts into consideration, concluding that there would be no loss in tourism revenue to Dare County because the loss of recreational opportunities in the Phase IIb location would not preclude similar recreational opportunities in other areas of Dare County. RD 23613; *see also* RD 23500–03.

88. The Outer Banks are geologically dynamic and subject to rapid, unpredictable change. RD 953.

89. This unpredictability was a major reason that Defendants decided on the Transportation Management Plan as the selected alternative in 2009—facilitating an immediate replacement of the Bonner Bridge while postponing decisions on later phases, which would be "based on actual conditions existing . . . at the point in time that additional action becomes necessary." AR 75561.

90. The 2010 Phase I EA reiterated the importance of analyzing alternatives in light of the most up-to-date information, explaining:

> Possible solutions for later phases of the project include bridging, road relocation, and/or beach nourishment. All of these solutions, which are available for implementation as part of the Preferred Alternative, were identified and assessed as part of the [2008] FEIS and ***would be reassessed at the time decisions on future phases are being made.***

RD 953 (emphasis added).

91. Defendants have repeatedly emphasized the importance of making decisions on each phase based on up-to-date shoreline information. RD 942 ("By actively monitoring the conditions and delaying decisionmaking, the environmental impacts can be better quantified, minimized, and mitigated."); RD 954 (stating that agency representatives "agreed that the

various alternatives may need to be reassessed in the future as the shoreline and other landscape features continue to change"); RD 966 (explaining that the phase-based approach would "allow[] for future decisions to be based on actual data rather than predicted shorelines"); RD 23529 (stating that the phase-based approach "takes into account the inherent uncertainty in predicting future conditions within the dynamic coastal environment"); RD 11565 (stating that "the conditions in the Bonner Bridge Replacement Project (B-2500) project area will be constantly re-assessed to determine whether the next project phase should be implemented"); AR 30524 (stating that "[t]he uncertainty as to what will actually happen as the project proceeds is an important consideration when evaluating the beach nourishment alternative.").  Indeed, the corridor-long Transportation Management Plan "includes firm commitments to study and mitigate the *future environmental conditions* prior to making decisions for the later phases." AR 75577 (emphasis added).

92.     The Merger Team based its decision to eliminate beach nourishment on a recommendation by an "expert panel" in October 2011, which in turn based its recommendation to eliminate beach nourishment on uncertainties regarding a suitable sand source and concerns regarding shoreline erosion.  RD 2888 ("The [Merger T]eam was informed that the expert panel agreed that the nourishment alternatives may not be viable due to the high erosion rate and a lack of a sand supply.").

93.     One of the primary reasons cited for the Merger Team's 2011 agreement to eliminate beach nourishment from detailed study was "uncertainties related to the availability of a suitable sand source . . . ."  RD 11573.

94.     This uncertainty stemmed from the fact that the 2008 FEIS "did not include an independent investigation of sand resources for beach nourishment."  AR 30503; *see also* AR

57320 (noting a sand source "off the coast near Rodanthe, but its quality, quantity, and suitability are not adequately known").

95.     In the summer of 2014, the U.S. Army Corps of Engineers (the "Corps") led an emergency beach nourishment project at the S Curves—the precise stretch of NC-12 addressed by the instant Phase IIb project.  RD 23461; RD 17365 (EA regarding emergency beach nourishment project).

96.     During this emergency beach nourishment project, the Corps "identified sand sources within Wimble Shoals" that were "compatible with the native beach sand in the project area."  RD 23461.

97.     The Corps also concluded that the beach nourishment project "would have no significant impacts" on the environment.  RD 23461.

98.     A study upon which the 2008 FEIS relied for cost analysis, which itself was drafted in 2005, "cautioned" the reader "to note that the unit cost for beach nourishment sand is difficult to predict, and given that it is a critical value in the total cost estimate, there can be significant differences between pre-project estimates and final costs."  AR 30515.

99.     The author of the study further advised NCDOT that "[t]he [cost] estimate for Rodanthe could potentially be improved knowing the borrow material."  RD 5783.

100.    A known "borrow material" for the S Curves was, in fact, determined during the Corps' emergency nourishment project in 2014.  *See* RD 23461.

101.    Defendants did not recalculate their cost estimates in light of the unit costs associated with this known borrow material.

102.    The 2008 FEIS assumed that nourishment would have to be repeated every four

years.  AR 57364.  But as the underlying study states, "[t]his is a somewhat arbitrary number,

and could be adjusted either up or down for either environmental or other reasons."  AR 30503.

103.    The 2008 FEIS assumed that half of the dune would need to be repaired every

third nourishment project, *i.e.*, every twelve years.  AR 57363.  But again, as the study on which

this assumption was based cautions, "[t]his 12-year assumption is of course just an educated

estimate and will depend upon the specific storms and conditions that occur."  AR 30508; *see*

*also* RD 956 ("Because of uncertainty regarding future storm events, additional coastal and

natural resource data will be collected and analyzed to evaluate the available range of

alternatives for future phases.").

104.    Multiple storms have in fact altered the geology of the project area since 2008.

*See* RD 28619; RD 970.

105.    Defendants have continued to rely on the 4-year nourishment and 12-year dune

assumptions as recently as the Phase IIb ROD itself.  RD 28628.

106.    The decision to eliminate beach nourishment from detailed study was made prior

to any estimate of costs as applied only to Phase IIb.  Rather, the only available cost estimates

were based on beach nourishment along the entire NC-12 corridor from Oregon Inlet to

Rodanthe.  AR 57321 (2008 FEIS cost table); RD 2909 (cost table included in agenda for

December 15, 2011 Merger Team meeting providing costs of alternatives based on entire length

of NC-12 from Oregon Inlet to Rodanthe); RD 4923–24 (Feb. 2, 2012 notes stating that the costs

are based on the "entire lengths of the alternatives" and that the costs will be updated for Phase

IIb for the alternatives carried forward for detailed study).

107.    In response to Plaintiff SOS OBX's comments on the 2016 Revised Phase IIb EA, requesting the reconsideration of beach nourishment, Defendants stated:

> The short-term nourishment project [directed by the Corps in 2014] cost $20.3 million.  This emergency nourishment project was designed by the USACE to last approximately three years and is on track to last between three and four years, depending on storm events.  If it or a similar program were repeated every four years at the same cost (12.5 times), the cost of 50 years of nourishment would be approximately $254 million.  The Selected Alternative [the Jug-Handle Bridge] is estimated to cost $179 to $198 million.

RD 28851.

108.    Unlike bridge construction, beach nourishment takes place in installments extending decades into the future.  *See* AR 57318–19.

109.    Beach nourishment requires a higher discount rate than bridge alternatives.  *See* AR 57318–19.

110.    In response to SOS OBX's comments, Defendants did not apply a discount rate to account for the time-value of money, thereby grossly inflating the present-value cost of beach nourishment.  RD 28851; *see also* AR 26326 (cost table showing tremendous disparity between nominal costs and present-value costs of beach nourishment).

111.    The shoreline-erosion projections that underlie the alternatives analysis in the 2008 FEIS are based on modeling data current through 2004.  AR 57445; RD 11592.

112.    Subsequent shoreline-erosion projections are based on improved methodologies, RD 29295, and have forecasted significantly less erosion than was initially projected.  For example, the 2016 Revised Phase IIb EA states that, based on data through 2014, the 2060 shoreline erosion is expected to be 350 to 590 feet less in Rodanthe, as compared to projections made in the 2008 FEIS.  RD 23478.  Likewise, as of 2014, the shoreline near the southern

Refuge boundary was still approximately 170 feet farther east than the 2008 FEIS's projection of the 2010 shoreline. RD 23478.

113. The 2008 FEIS states: "A risk that should be considered with respect to beach nourishment is that faster erosion than forecast is possible, which would result in more nourishment and therefore raise both the associated cost and sand required." AR 57323.

114. The 2008 FEIS grossly overestimated the extent of shoreline erosion in the Phase IIb project area. RD 11576 ("[T]he erosion in the Rodanthe area through 2060 is now forecast to be less than was forecast for the 2008 FEIS and 2010 EA"); RD 23459 (noting that "the 2014 forecast line is approximately 50 to 140 feet further east (oceanward) of the 2011 forecast," which was itself significantly further east than the 2008 FEIS forecast); RD 23798–804 (graphs showing westward shift in shoreline-erosion projections).

115. Additionally, Defendants implemented a coastal monitoring program in 2011 in order to update shoreline position data. RD 29284. The first report for this program was published in 2013 and was based on data generated through 2011. RD 29284.

116. The shoreline-erosion projection is set at the upper end of a 95-percent confidence interval. AR 57445.

117. Neither the 2013 Phase IIb EA nor the 2016 Revised Phase IIb EA evaluated the new information on sand sources, nourishment costs, and shoreline-erosion projections, in order to determine whether to reevaluate beach nourishment as a detailed study alternative.

118. NCDOT represented in 2013 that it would continue to reevaluate beach nourishment based on insights gleaned from nourishment projects at Nags Head, over 25 miles north of the Phase IIb area. RD 9372.

119.     The next year, in 2014, the Corps performed beach nourishment at the Phase IIb project area (i.e., zero miles away).  RD 23461.  Yet Defendants did not reevaluate beach nourishment in light of this information.

120.     The Jug-Handle Bridge entails occupation of 2.79 acres of new easement within the Refuge and the installation and use of haul roads through the Rodanthe Historic District, RD 28641, RD 26–27, as well as a 2.4-mile structure that will be erected in Pamlico Sound, RD 28634–37.

121.     Beach nourishment was excluded from the Section 4(f) Evaluation for Phase IIb. *See* RD 23532–57 (analyzing only the Easement Bridge and Jug-Handle Bridge for purposes of Section 4(f)).

122.     Beach nourishment has been "determined not to adversely affect the Refuge," RD 11516, and to have "no significant impacts" on the environment, RD 23461.

123.     The Administrative Record contains no indication that beach nourishment would involve any use of the Rodanthe Historic District.  *See* RD 11581 (noting that Corps' emergency nourishment project at the S Curves "would not affect historic resources"); RD 927 (map of project area showing beach nourishment taking place much farther away from the Rodanthe Historic District than the Jug-Handle Bridge).

124.     The Easement Bridge would remain in the existing easement and would not entail any new easement expansion within the Refuge.  As Defendants admit, the Easement Bridge would not entail any actual use of the Refuge, RD 23537, but rather only a constructive use in that it would create a visual impairment that detracts from the historic qualities of the Refuge, RD 23539–40.

125.    Defendants have also stated that the Easement Bridge would result "in the least initial direct impact to natural habitat as compared to the other . . . options."  RD 23486.

126.    Moreover, there is nothing in the record indicating that the Easement Bridge would entail the use of haul roads through the Rodanthe Historic District.

Dated:  January 10, 2018                Respectfully submitted,

/s/ Michael K. Murphy_____
Michael K. Murphy
   D.C. Bar No. 468907
   MMurphy@gibsondunn.com
Bryson C. Smith
   D.C. Bar No. 1025120
   BSmith@gibsondunn.com
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
Fax: (202) 530-9657
Counsel for Plaintiffs

/s/ Zia C. Oatley_____
Zia C. Oatley
KEAN MILLER, LLP
909 Poydras Street
Suite 3600
New Orleans, LA 70112
Tel: (504) 620-3346
Fax: (504) 620-3198
Zia.Oatley@keanmiller.com
NC Bar No. 44664
Local Civil Rule 83.1 Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of January, 2018, I electronically filed a copy of the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing, and pursuant to Local Civil Rule 5.1(e), shall constitute service upon, the following:

John G. Batherson
Colin Justice
North Carolina Department of Justice
1505 Mail Service Center
Raleigh, NC 27699
***Counsel for Defendants North Carolina Department of***
***Transportation and James H. Trogdon, III,***
***in his official capacity as Secretary of NCDOT***

Carter Fleeth Thurman
Neal Fowler
U.S. Department of Justice
601 D Street NW
Washington, D.C. 20001
***Counsel for Defendants Federal Highway Administration and***
***John F. Sullivan, III, in his official capacity as Division Administrator***
***of FHWA***

Derb S. Carter, Jr.
Kimberley Hunter
Nicholas S. Torrey
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
***Counsel for Defendant-Intervenors Defenders of Wildlife and***
***National Wildlife Refuge Association***

This the 10th day of January, 2018.

/s/ Bryson C. Smith
Bryson C. Smith